COMMONWEALTH *vs.* HARRY J. CANTER.

Suffolk. November 4, 1929. — November 29, 1929.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & WAIT, JJ.

*Libel,* Criminal. *Practice, Criminal,* Charge to jury. *Words,* "Murderer."

An indictment charged the defendant with criminal libel in the displaying of a placard reading: "Fuller — Murderer of Sacco and Vanzetti." At the trial of the indictment it appeared that "Fuller" as Governor had refused to grant a pardon to Sacco and Vanzetti and that consequently they had been executed for murder and that this was a matter of common knowledge. The defendant sought to show that he did not intend to make an accusation of murder of Sacco and Vanzetti in

the common meaning of the word, but only of moral responsibility for their death, and offered evidence to establish such moral responsibility. The evidence was excluded. ·The defendant was found guilty and alleged exceptions. *Held,* that

(1) The words on the placard, taken in their usual, natural and popular sense and without forced construction, imported a charge of wilful murder and were libellous *per se;*

(2) The words of the placard when published were not susceptible of meaning to the world that Fuller was not guilty of murder as a crime but was morally responsible for the deaths of Sacco and Vanzetti;

(3) The evidence offered properly was excluded;

(4) The verdict was warranted.

It is not sufficient for a defendant in an indictment for criminal libel to show by argument that words in form libellous were not intended to be such in fact, where the words published are not ambiguous and have a meaning that is entirely clear and well understood by everybody.

At the trial of the indictment above described, it was not error for the judge to refuse to give any of the following rulings: "The jury is not required to give to the alleged libellous words their literal or dictionary meaning. The jury should consider the words — 'Fuller — Murderer of Sacco and Vanzetti' — in the light of all the surrounding circumstances in determining their meaning. In interpreting the alleged libellous words, the jury is to apply the following test: how would reasonable men in the light of all the surrounding circumstances interpret the words used as affecting Alvan T. Fuller? If the words published are capable of two meanings, — one defamatory and the other not — it is a question of fact for the jury in what sense reasonable prudent persons may have understood them."

At the trial of the indictment above described, the judge charged the jury in substance, that the term "'murderer' has a meaning in the minds of ordinary men . . . that is what it does mean, when it is held before the people, what the ordinary man says it means. No ambiguity about it whatever . . . that is used, and is to be interpreted by you . . . in the plain, ordinary sense of the term. It is not a question of" what the defendant "intended in the private parts of his intelligence . . . it is what the world understands to be meant"; that, even supposing "that there were a lot of people there who did not believe that Fuller was a murderer, it is not a question of what people believed, but what is the general tendency of an accusation like that. . . . It is what the ordinary citizen means and understands to be meant by that expression used on that placard." *Held,* that

(1) It was not error for the judge to fail further to instruct the jury that they might consider the circumstances in which the term "murderer" was used and find in it as thus used a meaning different from the ordinary one;

(2) The charge did not violate the provisions of G. L. c. 231, § 81.

INDICTMENT, found and returned on December 10, 1928, and reading in substance as follows:

"The jurors for the Commonwealth of Massachusetts, on their oath present that prior to and at the time of the commission of the crime hereinafter set forth, one Alvan T. Fuller held a position of honor and trust in the said Commonwealth of Massachusetts, that is to say, he, the said Alvan T. Fuller, was then and there Governor of said Commonwealth of Massachusetts; and that Harry J. Canter on the third day of November in the year of our Lord one thousand nine hundred and twenty-eight, at Boston aforesaid, contriving and unlawfully and maliciously intending to injure, vilify and prejudice the said Alvan T. Fuller, both as an individual and as said Governor of said Commonwealth of Massachusetts, and to deprive him, the said Alvan T. Fuller, of his good name, fame, credit and reputation and to bring him, the said Alvan T. Fuller, into great contempt, scandal, infamy and disgrace, unlawfully and maliciously did compose, write, print and publish, and cause and procure to be composed, written, printed and published, in the form of a certain placard which he, the said Harry J. Canter, then and there carried and displayed to divers persons in front of a certain public building in said Boston called the State House, a certain false, scandalous, malicious and defamatory libel and representation of and concerning the said Alvan T. Fuller, and of and concerning the name, fame, reputation, character and course of life and conduct which he, the said Alvan T. Fuller, then and there exercised as an individual and as such Governor of said Commonwealth, which said false, scandalous, malicious and defamatory libel and representation is of the tenor following, that is to say:

FULLER (meaning the said Alvan T. Fuller, said Governor of the Commonwealth of Massachusetts) MURDERER (meaning one who slays or kills with deliberately premeditated malice aforethought, and meaning that the said Alvan T. Fuller is guilty of the crime of murder)

OF

SACCO AND VANZETTI

"He, the said Harry J. Canter then and there well knowing the said defamatory libel to be false; to the great damage, scandal and disgrace of the said Alvan T. Fuller."

The indictment was tried in the Superior Court before *Raymond*, J. Material evidence is stated in the opinion.

During the trial, and with respect to evidence offered by the defendant, the following colloquy occurred between the judge and counsel:

THE JUDGE: "I understood you admitted that he did not murder Sacco and Vanzetti." COUNSEL FOR THE DEFENDANT: "Moral responsibility." THE JUDGE: "On the ground of moral responsibility?" COUNSEL FOR THE DEFENDANT: "On the ground that he was morally responsible." THE ASSISTANT DISTRICT ATTORNEY: "As I understand it, everything of this is in on the feature of moral responsibility?" COUNSEL FOR THE DEFENDANT: "Yes." THE JUDGE: "That is, you are not claiming that Fuller did murder Sacco?" COUNSEL FOR THE DEFENDANT: "No."

Just before the close of the evidence, there was the following colloquy between the judge and counsel:

COUNSEL FOR THE DEFENDANT: "I would like to have it admitted that the fact that Sacco and Vanzetti were executed by the State was a matter of common knowledge. THE JUDGE: "I think there is no doubt about that." THE ASSISTANT DISTRICT ATTORNEY: "I suppose the court will take judicial notice of that."

At the close of the evidence, the defendant moved that a verdict of not guilty be ordered. The motion was denied.

The defendant then asked, among others, for the following rulings:

"3. The jury is not required to give to the alleged libellous words their literal or dictionary meaning.

"4. The jury should consider the words — 'Fuller — Murderer of Sacco and Vanzetti' — in the light of all the surrounding circumstances in determining their meaning."

"6. In interpreting the alleged libellous words, the jury is to apply the following test: how would reasonable men in the light of all the surrounding circumstances interpret the words used as affecting Alvan T. Fuller?

"7. If the words published are capable of two meanings, — one defamatory and the other not — it is a question of fact for the jury in what sense reasonable prudent persons may have understood them."

"A. The charge against the defendant is that he called Alvan T. Fuller 'murderer,' meaning one who slays or kills, with deliberately premeditated malice aforethought, and meaning that the said Alvan T. Fuller is guilty of the crime of murder. If you find that the defendant did not mean this, and that those who read the words did not understand them to mean this, then the defendant must be acquitted.

"B. The question in this case depends upon what the defendant intended and how his words would be understood by those who would see them. In connection with this you must bear in mind that it was generally known that Sacco and Vanzetti had been in jail for several years and that they were executed by the State."

"D. If the defendant intended by the words to convey the thought that Governor Fuller was morally responsible for the death of Sacco and Vanzetti, and that the words were or would be so understood by those who saw them, then you must acquit the defendant because that is not the crime charged against him.

"E. You may think that the defendant was wrong and should be punished for carrying a placard containing such words, even though he only intended to convey the thought that Governor Fuller was morally responsible for the death of these men and that the words would be so understood, but in this case your consideration is limited by the indictment, as to whether the defendant used the words and that they were understood in the sense contained in the indictment. If the defendant is subject to trial and punishment for carrying that placard and using those words, even though he meant them in another sense, that might be a question for another tribunal to decide, but that is not the question before you."

The judge charged the jury in substance as follows:

"Here is a case of criminal libel against this young man

Canter, and the facts are, in substance, that in a procession up in front of the State House he carried this placard, which will be in your hands, it is very brief, and you can see what it is. . . .

"Now, . . . what is this man charged with? He is charged with criminal libel, doing something in the nature of a publication that defamed, so that it tended to bring somebody, the one referred to, into hatred, hostility, contempt, or ridicule, and as has been said here, so that it tended to bring about a breach of the peace. Well, now, what are the questions that you gentlemen are to answer? What are the real issues? What are the points of contradiction which you are to pass upon and solve in returning your verdicts?

"You saw the placard there. The young man, Canter, as I understand his name is, says that he carried the placard. He said, or perhaps his counsel admitted, that it is not true. Well, these are two elements which go into this offense which you ought to have in mind; that it is admitted here that the young man carried that placard, and that it was false. Well, what else is there left? There is something else left.

"Criminal libel, in order to warrant a conviction by a jury means that the act that was done, which was the publication, which is admitted, as I have said, that the publication was done with malicious intent.

"Well, now, I have discussed malice before you gentlemen before, I have an idea that I have, quite a good many times. That does not mean, necessarily, that Canter had the spirit of hatred, or ill-will, or hostility toward the man whose name appears there, Fuller; it is not that. If he is carrying a publication which is false, — as this is admitted to be — and whose tendency is to do the harms that I have alluded to, to defame a person, bring him into hatred, ridicule or contempt in the community, or to start a breach of the peace, a disturbance of the peace, a riot, or insurrection, or anything of that sort, that is all that is meant by the Commonwealth as the Commonwealth has defined malice ever since it began to write its decisions.

Now, it has been argued with great ability and persuasive-
ness by Mr. Hays that Mr. Canter did not mean to charge
Fuller with murder, not that; that he meant to charge him
as morally responsible for the death of two men who are
named here, Sacco and Vanzetti. It is not a question of
what he secretly, back in his head somewhere, meant. It
is a question of what he said and what the words mean.

"Now, these are words that are used, of course, which have
an ambiguous meaning, you cannot understand what they
do mean unless you have a knowledge of history but you
may imagine. Well, you have heard about the Magna
Charta in the splendid speech which our friend made here,
about the Magna Charta. Well, that is a name that would
require historical knowledge to understand the meaning
of Magna Charta, or some of the other terms that we lawyers
use. We lawyers have a great facility for using big words,
and sometimes our language is not as clear to the ordinary
citizen as it might be. And so, if a term is ambiguous
and uncertain in its meaning to the ordinary man, some
explanation as to its meaning may be offered in evidence.
But what I am saying here is that that term there 'mur-
derer' has a meaning in the minds of ordinary men — I am
not talking about the specific legal meaning now — but
when you hear a man accused of being a murderer, I am
taking it that there is some meaning arises in your minds.
You have an idea what is meant, a pretty definite idea,
have you not?

"Now, if there be a clear, definite, certain meaning of a
term that is used, a meaning on the part of the people,
not on the part of lawyers, on the part of the people, it is
for you to give that meaning to the word that is used here
— which, perhaps we may say, is a word used more often
than we wish it were; often enough thought about enough
by all us common people so that we have a definite idea
in our minds what that word means. Now, that is what it
does mean, when it is held before the people, what the
ordinary man says it means. No ambiguity about it what-
ever. Of course, a man may use a term in an entirely differ-
ent meaning from what we ordinary people understand

by the term. We cannot get into the inside of his intelligence very well. How can we get his inner meaning except by the acts that he does, the words that he uses? I do not know of any method. I have not heard even from learned counsel of any method of getting at a man's inner intention as to what a word that he uses may be meaning except by taking the word itself, and we know what that means, you know what that means.

"Now, that is used, and is to be interpreted by you gentlemen in the plain, ordinary sense of the term. It is not a question of whether Mr. Canter intended in the private parts of his intelligence to be complimentary or contrawise, if he published to the world this expression that is given on this placard — which will be in your hands so that you can see it — it is what the world understands to be meant.

"Now, there is another step there that you gentlemen ought to bear in mind. It is not a question of whether you or the people who were around there — we heard of fifty or seventy-five or a hundred, I don't know how many, but there were a lot of people up around the State House there, and possibly there were more, because this thing was going on and it seems to have been known for seven minutes at least, and I don't know how much longer, and there were many people there, I don't know that we have any definite information on that — but suppose that Fuller's good friend was there and he did not believe that Fuller was a murderer, or that there were a lot of people there who did not believe that Fuller was a murderer, it is not a question of what people believed, but what is the general tendency of an accusation like that. Suppose there had been nobody there but Mr. Fuller's wife and daughter — if he has any, and I do not know whether he has any or not — or the immediate members of his family, and they knew that the thing was not true, it would have been a libel, and if it were malicious, in accordance with the definition that I have given you of malice, it would have been a malicious libel and if its tendency was to make the people restless and turbulent, and had a tendency to lead them into riot or insurrection

or a breach of the peace, it is a criminal libel, and the person who does it would be guilty of criminal libel. . . .

"Somebody said that Fuller had been Governor. We do not care whether he had been Governor or President, or hog-reeve. That is not the question here. The question is whether that man over there, Canter, did something that he had no business to have done, that was dangerous to the peace of the citizens of the Commonwealth, and that is defamatory, and did it maliciously, and knew what he was doing when he did it. Now, so far as doing it, he says, 'I did it. I know now and I knew then that it was false, that Mr. Fuller was not the murderer of Sacco and Vanzetti. That from a long history' — that perhaps we know fully as well as he, — 'from a long history involved and complicated, Mr. Fuller was morally responsible for the death of those two men.'

"But that is not what he says. You are trying him on what he said. Do not get away from that. You are trying him on what he said, with the ordinary, natural implications that you common sense men draw from what he said, as to whether that was malicious on his part, doing what he had no right to do, not because he hated Fuller, not that, but doing what he had no right to do, falsely, and in doing a thing whose tendency was to put Fuller into a position where he was likely to incur the contempt and ridicule of good men, and the tendency of which was also to stir up a breach of the peace, disturbance, insurrection, riot, whatever you may call it. What do you say about it, gentlemen?

"I think I have taken all the time that I need to take. Take that placard into your jury room with you and look at it. What does it mean? It means what you say it means as common men, and you are taken as kind of a cross section of the county of Suffolk and the inhabitants of the county of Suffolk, to say just what these things do mean.

"It is not a technical, legal meaning that I am instructing you upon. It is not a secret intention of a man, whose secret intention we cannot find out except by what he does. It is what the ordinary citizen means and understands to

be meant by that expression used on that placard which he carried at the head of that procession. . . .

"Now, something has been said about what Mr. Canter meant or understood or how he interpreted that. I think I was asked to say — I believe counsel did say, although there was no testimony, but that was part of the agreement — that people knew that Sacco and Vanzetti had been tried and had been executed at that time in accordance with the forms of the law, and the papers were put in. . . . But it was generally known that these men had been executed in a prison somewhere by the forms of law. Well, that is generally known. I do not mean by that, and I guess I would not have the power to say from that that everybody knew it, or how every individual out in the crowd there across the street and on the Common, wherever they were, how everybody understood that; I don't know about that, and I don't know that that was argued, as to whether any individuals were over there that did not know anything about these two men and the crime with which they had been charged. We do not know anything about it.

"At any rate, it does not make any difference as to the private interpretation put upon it by Canter or the interpretation put upon it by some individual out in the Common, for instance, who heard whatever hullabaloo there was and saw this and went off thinking to himself. We have no power to get at the general interpretation that Mr. Canter or a great many citizens made of this, and so we have to take the plain, ordinary signification that we know as ordinary men, and you will take it in that way.

"Now, if this man did this thing with the purpose, with the malicious intent that I have described here, not necessarily to hurt, but if he did it with the intent to hurt, did a thing which was false, and which he knew was false and harmful, and you may say to the greatest degree, not only about Fuller, but as stirring up the people generally whether they believed it or did not believe it, if you should believe that, then the man is guilty and you will say that he is guilty. If there be in your minds a reasonable doubt, such

doubt as reasonable men exercise when they act reasonably, on all the evidence that you have listened to, you should give him the benefit of the doubt and say he is not guilty."

After conference with counsel the judge further charged the jury as follows, quoting first from the defendant's request B: "'The question in this case depends upon what the defendant intended and how his words would be understood by those who would see them' — as far as we know, how they would be understood by those who would see them. And I ought to say in that connection, that it was generally understood that these two men had gone to the chair under the procedure of the courts and the regular procedure. But what I said before, I think, and what is repeated now, is this: We do not know what the one hundred and ten or nine hundred and ninety people who stood around there understood except as you are supposed to be the average reasonable man of the community, and how they would understand it. I know of no way to reach a conclusion of that except how you understand the interpretation of that language. You remember what I said: the fact that it was false or known or believed to be false, is not the question before you. What those words mean and all the circumstances of the case — that I know of no way to get at, except through you, the ordinary man of the community, the jury."

The defendant saved exceptions in the following language: "to the part of your honor's charge where you said that the term 'murderer' has a definite meaning to the ordinary men, in that you failed to point out that the jury might consider the circumstances under which the term was used, they may make it a different meaning than the ordinary one"; "to such portions of your charge in which your honor charged upon the facts in the case, especially with reference to the meaning of the word 'murderer' used on the placard"; "to the statement of your honor where you referred to 'a publication that is false as this is admitted to be'. We admit the publication to be false only in the literal, restricted sense of the term 'murderer'. We do

not admit its falsity if one interprets the card to read that Fuller was morally responsible."

There was a verdict of guilty. The defendant. alleged exceptions which, after the death of *Raymond*, J., were allowed by *Lummus*, J.

*H. Hoffman*, (*E. S. Farmer* with him,) for the defendant.

*D. J. Gillen*, Assistant District Attorney, for the Commonwealth.

PIERCE, J. The defendant was indicted for criminal libel on December 10, 1928; he pleaded "not guilty"; he was tried by a jury and on May 27, 1929, was found "guilty." During the trial his counsel made several offers of proof, which were excluded subject to the defendant's exceptions. At the close of all the evidence the defendant presented a motion to direct a verdict in his favor; the motion was denied and an exception saved. The defendant then requested certain rulings, which had been seasonably filed; subject to the defendant's exceptions the presiding judge refused to grant requests 3, 4, 6, 7, A, B, D and E. At the close of the charge the defendant excepted to certain portions thereof. The case comes before this court on the foregoing exceptions, which are argued generally on the defendant's brief.

At the close of the evidence the judge, without objection by the Commonwealth or the defendant, instructed the jury "that people knew that Sacco and Vanzetti had been tried and had been executed . . . in accordance with the forms of the law," at the time the alleged libel was published. It further appeared without question that the case of Sacco and Vanzetti had been brought several times before this court; that they had applied in the year 1927 to Governor Fuller for pardon; that the application was denied by him and that they were duly executed by the warden of the State prison on August 23, 1927.

It appears from the record, and is not disputed by the defendant, that about two o'clock on the afternoon of November 3, 1928, the defendant marched at the head of about twenty-five persons in single line in front of the State House on the State House side of Beacon Street for seven or eight minutes; that he carried a placard bearing the words

"Fuller — Murderer of Sacco and Vanzetti"; that there were people on the same side of the street watching the procession and about fifty or seventy-five people across the street on the side of the Common. Aside from sauntering and loitering there was no breach of the peace and no disorder. At the trial the defendant admitted that the placard carried by him referred to Alvan T. Fuller, then Governor of the Commonwealth of Massachusetts, and that "Sacco" and "Vanzetti" mentioned on the placard were Nicola Sacco and Bartolomeo Vanzetti who had been executed for the crime of murder in the Commonwealth.

The defendant, while under arrest at the station house, in reply to the question "what the idea was of parading up and down before the State House carrying the sign," said: "because these men Sacco and Vanzetti had been executed illegally and we think Governor Fuller is the man who is to blame for the carrying out of the execution." The words, "Fuller — Murderer of Sacco and Vanzetti," taken in their usual, natural and popular sense and without forced construction, import a charge of the most heinous crime known to the law — wilful murder — and are libellous *per se.* Giving to the words their primary meaning the publication of them was well calculated to injure the reputation of Governor Fuller, to degrade him in society, to lower him in the confidence of the community, and to bring him into public hatred and contempt. The defendant, not denying the publication by him of the words displayed on the placard or the falsity of them in so far as they import wilful murder, offered to prove that the police officers and everybody else present on the occasion of his arrest would testify that they understood the words used were used not in the sense that Governor Fuller had been guilty of murder as set forth in the indictment, but that he was morally responsible for the deaths of Sacco and Vanzetti, and contended that the question whether such was the fact was purely a question of fact for the jury. Based upon the presumed common knowledge that Sacco and Vanzetti were executed by the Commonwealth of Massachusetts more than a year prior to the parade of the defendant and others with the placard, the defendant

contends that nobody could take the words published to mean as stated in the indictment that Governor Fuller had been guilty of murder with malice aforethought.

Disregarding as surplusage the innuendo of the indictment, wherein the word "Murderer" as printed on the placard is defined as "meaning one who slays or kills with deliberately premeditated malice aforethought, and meaning that the said Alvan T. Fuller is guilty of the crime of murder," *Commonwealth* v. *Snelling*, 15 Pick. 321, 335, *Commonwealth* v. *Szliakys*, 254 Mass. 424, it is plain the words of the placard when published were not susceptible of meaning to the world that Governor Fuller was not guilty of murder as a crime but was morally responsible for the deaths of Sacco and Vanzetti. *Thomas* v. *Blasdale*, 147 Mass. 438. It is not sufficient for a defendant to show by argument that words in form libellous were not intended to be such in fact, where the words published are not ambiguous and have a meaning that is perfectly clear and well understood by everybody. There was no error in the refusal to direct a verdict for the defendant, in the refusal to receive the testimony offered to prove that the words were used to mean only that Governor Fuller was morally responsible for the deaths of Sacco and Vanzetti, in the refusal to receive the testimony offered to prove the truth of the publication assumed to have the meaning ascribed to the words by the defendant, in the denial of the requests for rulings to which exception was taken, in the exception taken to the charge, or in any of the exceptions which have been argued.

*Exceptions overruled.*