## BEAUHARNAIS *v.* ILLINOIS.

No. 118. Argued November 28, 1951.—Decided April 28, 1952.

*Alfred A. Albert* argued the cause for petitioner. With him on the brief was *Herbert Monte Levy*.

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were *Ivan A. Elliott,* Attorney General, *John T. Coburn,* Assistant Attorney General, and *Albert I. Zemel.*

Mr. Justice Frankfurter delivered the opinion of the Court.

The petitioner was convicted upon information in the Municipal Court of Chicago of violating § 224a of the Illinois Criminal Code, Ill. Rev. Stat., 1949, c. 38, Div. 1, § 471. He was fined $200. The section provides:

> "It shall be unlawful for any person, firm or corporation to manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place in this state any lithograph, moving picture, play, drama or sketch, which publication or exhibition portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion which said publication or exhibition exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots. . . ."

Beauharnais challenged the statute as violating the liberty of speech and of the press guaranteed as against the States by the Due Process Clause of the Fourteenth Amendment, and as too vague, under the restrictions implicit in the

same Clause, to support conviction for crime. The Illinois courts rejected these contentions and sustained defendant's conviction. 408 Ill. 512, 97 N. E. 2d 343. We granted certiorari in view of the serious questions raised concerning the limitations imposed by the Fourteenth Amendment on the power of a State to punish utterances promoting friction among racial and religious groups. 342 U. S. 809.

The information, cast generally in the terms of the statute, charged that Beauharnais "did unlawfully . . . exhibit in public places lithographs, which publications portray depravity, criminality, unchastity or lack of virtue of citizens of Negro race and color and which exposes [sic] citizens of Illinois of the Negro race and color to contempt, derision, or obloquy . . . ." The lithograph complained of was a leaflet setting forth a petition calling on the Mayor and City Council of Chicago "to halt the further encroachment, harassment and invasion of white people, their property, neighborhoods and persons, by the Negro . . . ." Below was a call for "One million self respecting white people in Chicago to unite . . . ." with the statement added that "If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions . . . rapes, robberies, knives, guns and marijuana of the negro, surely will." This, with more language, similar if not so violent, concluded with an attached application for membership in the White Circle League of America, Inc.

The testimony at the trial was substantially undisputed. From it the jury could find that Beauharnais was president of the White Circle League; that, at a meeting on January 6, 1950, he passed out bundles of the lithographs in question, together with other literature, to volunteers for distribution on downtown Chicago street corners the following day; that he carefully organized that distribution, giving detailed instructions for it; and that

the leaflets were in fact distributed on January 7 in accordance with his plan and instructions. The court, together with other charges on burden of proof and the like, told the jury "if you find . . . that the defendant, Joseph Beauharnais, did . . . manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place the lithograph . . . then you are to find the defendant guilty . . . ." He refused to charge the jury, as requested by the defendant, that in order to convict they must find "that the article complained of was likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest." Upon this evidence and these instructions, the jury brought in the conviction here for review.

The statute before us is not a catchall enactment left at large by the State court which applied it. Cf. *Thornhill* v. *Alabama,* 310 U. S. 88; *Cantwell* v. *Connecticut,* 310 U. S. 296, 307. It is a law specifically directed at a defined evil, its language drawing from history and practice in Illinois and in more than a score of other jurisdictions a meaning confirmed by the Supreme Court of that State in upholding this conviction. We do not, therefore, parse the statute as grammarians or treat it as an abstract exercise in lexicography. We read it in the animating context of well-defined usage, *Nash* v. *United States,* 229 U. S. 373, and State court construction which determines its meaning for us. *Cox* v. *New Hampshire,* 312 U. S. 569; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568.

The Illinois Supreme Court tells us that § 224a "is a form of criminal libel law." 408 Ill. 512, 517, 97 N. E. 2d 343, 346. The defendant, the trial court and the Supreme Court consistently treated it as such. The defendant offered evidence tending to prove the truth of parts of the utterance, and the courts below considered and disposed of

this offer in terms of ordinary criminal libel precedents.[1] Section 224a does not deal with the defense of truth, but by the Illinois Constitution, Art. II, § 4, "in all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense." See also Ill. Rev. Stat., 1949, c. 38, § 404. Similarly, the action of the trial court in deciding as a matter of law the libelous character of the utterance, leaving to the jury only the question of publication, follows the settled rule in prosecutions for libel in Illinois and other States.[2] Moreover, the Supreme Court's characterization of the words prohibited by the statute as those "liable to cause violence and disorder" paraphrases the traditional justification for punishing libels criminally, namely their "tendency to cause breach of the peace." [3]

Libel of an individual was a common-law crime, and thus criminal in the colonies. Indeed, at common law, truth or good motives was no defense. In the first decades after the adoption of the Constitution, this was changed by judicial decision, statute or constitution in most States, but nowhere was there any suggestion that

---

[1] 408 Ill. 512, 518, 97 N. E. 2d 343, 346–347. Illinois law requires that for the defense to prevail, the truth of all facts in the utterance must be shown together with good motive for publication. *People* v. *Strauch,* 247 Ill. 220, 93 N. E. 126; *People* v. *Fuller,* 238 Ill. 116, 87 N. E. 336; cf. *Ogren* v. *Rockford Star Printing Co.,* 288 Ill. 405, 123 N. E. 587.

[2] See, *e. g., State* v. *Sterman,* 199 Iowa 569, 202 N. W. 222; *State* v. *Howard,* 169 N. C. 312, 313, 84 S. E. 807–808; cf. *Ogren* v. *Rockford Star Printing Co., supra.*

[3] See, *e. g., People* v. *Spielman,* 318 Ill. 482, 489, 149 N. E. 466, 469; Odgers, Libel and Slander (6th ed.), 368; 19 A. L. R. 1470. Some States hold, however, that injury to reputation, as in civil libel, and not tendency to breach of the peace, is the gravamen of the offense. See Tanenhaus, Group Libel, 35 Cornell L. Q. 261, 273 and n. 67.

the crime of libel be abolished.[4]    Today, every American jurisdiction—the forty-eight States, the District of Columbia, Alaska, Hawaii and Puerto Rico—punish libels directed at individuals.[5]    "There are certain well-defined

---

[4] For a brief account of this development see Warren, History of the American Bar, 236–239.   See also correspondence between Chief Justice Cushing of Massachusetts and John Adams, published in 27 Mass. L. Q. 11–16 (Oct. 1942).   Jefferson explained in a letter to Abigail Adams, dated September 11, 1804, that to strike down the Alien and Sedition Act would not "remove all restraint from the overwhelming torrent of slander which is confounding all vice and virtue, all truth and falsehood in the US.   The power to do that is fully possessed by the several state legislatures."   See *Dennis* v. *United States,* 341 U. S. 494, 522, n. 4.   See Miller, Crisis in Freedom, 168–169, 231–232.   See also provisions as to criminal libel in Edward Livingston's famous draft System of Penal Law for Louisiana, 2 Works of Edward Livingston 100–108.

[5] In eight States the offense is punished as at common law, without legislative enactment.   *State* v. *Roberts,* 2 Marv. (Del.) 450, 43 A. 252; *Cole* v. *Commonwealth,* 222 Ky. 350, 300 S. W. 907; *Robinson* v. *State,* 108 Md. 644, 71 A. 433; *Commonwealth* v. *Canter,* 269 Mass. 359, 168 N. E. 790; *State* v. *Burnham,* 9 N. H. 34; *State* v. *Spear,* 13 R. I. 324; *State* v. *Sutton,* 74 Vt. 12, 52 A. 116; *State* v. *Payne,* 87 W. Va. 102, 104 S. E. 288.   Twelve other jurisdictions make "libel" a crime by statute, without defining the term.   Ala. Code, 1940, Tit. 14, § 347; Alaska Comp. Laws Ann., 1949, § 65–4–28; D. C. Code, 1940, § 22–2301; Fla. Stat. Ann., 1944, § 836.01; Burns Ind. Stat., 1933, § 10–3201; Miss. Code, 1942, § 2268; Neb. Rev. Stat., 1943, § 28–440; N. J. Stat. Ann., 1939, § 2:146–1; N. C. Gen. Stat., 1943, § 14–47; Page's Ohio Gen. Code, 1939, § 13383; Wis. Stat., 1949, § 348.41; Wyo. Comp. Stat., 1945, § 9–1601.   Thus, twenty American jurisdictions punish "libel" as defined by the case-by-case common-law development.

The remaining jurisdictions have sought to cast the common-law definition in a statutory form of words.   Two formulas have been popular.   Eleven jurisdictions, Illinois among them, have accepted with minor variations the following:

"A libel is a malicious defamation, expressed either by printing, or by signs or pictures, or the like, tending to blacken the memory of one

and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utter-

who is dead, or to impeach the honesty, integrity, virtue or reputation or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule, or financial injury." Smith-Hurd Ill. Ann. Stat., 1936, c. 38, § 402. Ariz. Code Ann., 1939, § 43.3501; Ark. Stat., 1947, § 41–2401; Deering's Cal. Penal Code, 1949, § 248; Colo. Stat. Ann., 1935, c. 48, § 199; Ga. Code Ann., 1936, § 26–2101; Idaho Code, 1947, § 18–4801; Smith-Hurd Ill. Ann. Stat., 1936, c. 38, § 402; Mont. Rev. Codes, 1947, § 94–2801; Nev. Comp. Laws, 1929, § 10110; P. R. Codigo Penal, 1937, § 243; Utah Code Ann., 1943, § 103–38–1; cf. Virgin Islands Code, 1921, Tit. IV, c. 5, § 36.

The other version, again with minor variations, has found favor in twelve jurisdictions.

"A libel is a malicious defamation of a person, made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse; or any malicious defamation, made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives or friends."

Iowa Code Ann., 1949, § 737.1; Kan. Gen. Stat., 1935, § 21–2401; Dart's La. Crim. Code, 1943, Art. 740–47; Me. Rev. Stat., 1944, c. 117, § 30; Minn. Stat., 1949, § 619.51; Mo. Rev. Stat., 1949, § 559.410; McKinney's N. Y. Laws, Penal Code, § 1340; N. D. Rev. Code, 1943, § 12–2801; Okla. Stat. Ann., 1936, Tit. 21, § 771; Purdon's Pa. Stat. Ann., 1945, Tit. 18, § 4412; Williams Tenn. Code, 1934, §§ 11021, 11022; Remington's Wash. Rev. Stat., 1932, § 2424.

The remaining nine jurisdictions have definitions of criminal libel which fall into no common pattern. See Conn. Gen. Stat., 1949, § 8518; Hawaii Rev. Laws, 1945, § 11450; Mich. Comp. Laws, 1948, § 750–370; N. M. Stat., 1941, §§ 41–2701, 41–2708; Ore. Comp. Laws, 1940, § 23–437; S. C. Code, 1942, § 1395; S. D. Code, 1939,

ances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut,* 310 U. S. 296, 309–310." Such were the views of a unanimous Court in *Chaplinsky* v. *New Hampshire, supra,* at 571–572.[6]

No one will gainsay that it is libelous falsely to charge another with being a rapist, robber, carrier of knives and

§ 13.3401; Vernon's Tex. Stat., 1948, Arts. 1269, 1275; Va. Code, 1950, § 18–133.

Our examination of the homogeneity of these statutory definitions of criminal libel might well begin and end with the words "virtue" and "ridicule." Of thirty-two jurisdictions, twelve outlaw statements impeaching the "virtue" of another; eleven of these, and fifteen more—twenty-six in all—prohibit utterances tending to bring another into "public ridicule."

For the common-law definition, applicable in the twenty jurisdictions first noted above, see L. Hand, J., in *Grant* v. *Reader's Digest Assn.,* 151 F. 2d 733, 735, where he speaks of defining libel "in accordance with the usual rubric, as consisting of utterances which arouse 'hatred, contempt, scorn, obloquy or shame,' and the like." Cf. Restatement, Torts, § 559, *comment* (b); Odgers, Libel and Slander (6th ed.), 16–17; Newell, Slander and Libel (4th ed.), 1–2.

Even a cursory examination of these enactments and common-law pronouncements demonstrates that Illinois, in § 224a, was using a form of words which invoked the familiar common law of libel to define the prohibited utterances. The defendant and the Illinois courts, as we have seen, understood this and acted upon it.

[6] In all but five States, the constitutional guarantee of free speech to every person is explicitly qualified by holding him "responsible for the abuse of that right." See *Pennekamp* v. *Florida,* 328 U. S. 331, 356, n. 5. See Jefferson in Kentucky Resolutions of 1798 and 1799, 4 Elliot's Debates 540–541, and in an undated draft prepared, but not used, for his December 8, 1801, Message to Congress, Library of

guns, and user of marijuana. The precise question before us, then, is whether the protection of "liberty" in the Due Process Clause of the Fourteenth Amendment prevents a State from punishing such libels—as criminal libel has been defined, limited and constitutionally recognized time out of mind—directed at designated collectivities and flagrantly disseminated. There is even authority, however dubious, that such utterances were also crimes at common law.[7] It is certainly clear that some American jurisdictions have sanctioned their punishment under ordinary criminal libel statutes.[8] We cannot say, however, that the question is concluded by history and practice. But if an utterance directed at an individual may be the object of criminal sanctions, we cannot deny to a State power to punish the same utterance directed at a defined group, unless we can say that this is a wilful and purposeless restriction unrelated to the peace and well-being of the State.

Illinois did not have to look beyond her own borders or await the tragic experience of the last three dec-

---

Congress Jefferson Papers, Vol. 119, Leaf 20569. In *Carlson* v. *California*, 310 U. S. 106, 112, we noted that the statute there invalidated made "no exceptions with respect to the truthfulness and restraint of the information conveyed . . . ."

[7] Compare reports of *King* v. *Osborne* in 2 Barn. K. B. 138, 166, 94 Eng. Rep. 406, 425; 2 Swans. 503, n. (*c*), 36 Eng. Rep. 705, 717; W. Kel. *230, 25 Eng. Rep. 584 (1732). The present Attorney General of England asserted that this case obviated the need of special group libel legislation for Great Britain. See The [London] Times, March 26, 1952, p. 2, col. 4. See also Odgers, Libel and Slander (6th ed.), 369; Tanenhaus, Group Libel, 35 Cornell L. Q. 261, 267–269.

[8] One of the leading cases arose in Illinois. *People* v. *Spielman*, 318 Ill. 482, 149 N. E. 466 (1925), sustaining a conviction for libel on the members of the American Legion. The authorities are collected and discussed in Tanenhaus, Group Libel, 35 Cornell L. Q. 261, 269–276.

ades [9] to conclude that wilful purveyors of falsehood concerning racial and religious groups promote strife and tend powerfully to obstruct the manifold adjustments required for free, ordered life in a metropolitan, polyglot community. From the murder of the abolitionist Lovejoy in 1837 to the Cicero riots of 1951, Illinois has been the scene of exacerbated tension between races, often flaring into violence and destruction.[10] In many of these outbreaks, utterances of the character here in question, so the Illinois legislature could conclude, played a significant part.[11] The law was passed on June 29, 1917, at a time when the State was struggling to assimilate vast numbers of new inhabitants, as yet concentrated in discrete racial or national or religious groups—foreign-born brought to it by the crest of the great wave of immigration, and Negroes attracted by jobs in war plants and the allure-

---

[9] See, *e. g.*, Loewenstein, Legislative Control of Political Extremism in European Democracies, 38 Col. L. Rev. 591 and 725; Riesman, Democracy and Defamation, 42 Col. L. Rev. 727, 1085 and 1282; Public Order Act, 1936, 1 Edw. VIII and 1 Geo. VI, c. 6, and 317 H. C. Deb. 1349–1473 (5th ser. 1936); 318 H. C. Deb. 49–193, 581–710, 1659–1785, 2781–2784 (5th ser. 1936); 103 H. L. Deb. 741–773, 961–972 (5th ser. 1936).

[10] See generally The Chicago Commission on Race Relations, The Negro in Chicago, 1–78, and *passim* (University of Chicago Press, 1922); Research Memorandum No. 5, First Annual Rep. Ill. Inter-Racial Comm'n (1944).

[11] The May 28, 1917, riot in East St. Louis, Illinois, was preceded by a violently inflammatory speech to unemployed workmen by a prominent lawyer of the town. Report of the Special Committee Authorized by Congress to Investigate the East St. Louis Riots, H. R. Doc. No. 1231, 65th Cong., 2d Sess. 11; Chicago Commission on Race Relations, The Negro in Chicago, 75. And see *id.*, at 118–122 for literature circulated by real estate associations and other groups during the series of bombings leading up to the Chicago riots of 1919. For the Commission's comments on the role of propaganda in promoting race frictions, see *id.*, at 589, 638–639.

ments of northern claims.[12]  Nine years earlier, in the very city where the legislature sat, what is said to be the first northern race riot had cost the lives of six people, left hundreds of Negroes homeless and shocked citizens into action far beyond the borders of the State.[13]  Less than a month before the bill was enacted, East St. Louis had seen a day's rioting, prelude to an outbreak, only four days after the bill became law, so bloody that it led to Congressional investigation.[14]  A series of bombings had begun which was to culminate two years later in the awful race riot which held Chicago in its grip for seven days in

[12] Tables in Drake and Cayton, Black Metropolis, 8, show that between 1900 and 1920 the number of foreign-born in Chicago increased by over $\frac{1}{3}$ and the Negro population trebled.  United States census figures show the following population growth for the State as a whole and selected counties:

| | Illinois | | Cook County (Chicago) | | St. Clair County (East St. Louis) | |
|---|---|---|---|---|---|---|
| | Total | Negro | Total | Negro | Total | Negro |
| 1900...... | 4,821,550 | 85,078 | 1,838,735 | 31,838 | 86,685 | 3,987 |
| 1910...... | 5,638,591 | 109,049 | 2,405,233 | 46,627 | 119,870 | 8,110 |
| 1920...... | 6,485,280 | 182,274 | 3,053,017 | 115,238 | 136,520 | 10,136 |
| 1930...... | 7,630,654 | 328,972 | 3,982,123 | 246,992 | 157,775 | 15,550 |
| 1940...... | 7,897,241 | 387,446 | 4,063,342 | 249,157 | 166,899 | 21,567 |
| 1950...... | 8,712,176 | 645,989 | 4,508,792 | 521,007 | 205,995 | 34,566 |

For an account of these vast population movements entailing great social maladjustments, see Drake and Cayton, Black Metropolis, 8–18, 31–65; Chicago Commission on Race Relations, The Negro in Chicago, 79–105; Carl Sandburg, The Chicago Race Riots, 9–30.

[13] See Walling, Race War in the North, 65 The Independent 529 (1908).  This article apparently led to the founding of the National Association for the Advancement of Colored People.  Ovington, How the National Association for the Advancement of Colored People Began, 8 Crisis 184 (1914).  See also Chicago Commission on Race Relations, The Negro in Chicago, 67–71.

[14] Report of the Special Committee Authorized by Congress to Investigate the East St. Louis Riots, H. R. Doc. No. 1231, 65th Cong., 2d Sess.  See also The Massacre of East St. Louis, 14 Crisis 219 (1917).

the summer of 1919.[15]  Nor has tension and violence between the groups defined in the statute been limited in Illinois to clashes between whites and Negroes.

In the face of this history and its frequent obligato of extreme racial and religious propaganda, we would deny experience to say that the Illinois legislature was without reason in seeking ways to curb false or malicious defamation of racial and religious groups, made in public places and by means calculated to have a powerful emotional impact on those to whom it was presented.  "There are limits to the exercise of these liberties [of speech and of the press].  The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all.  These and other transgressions of those limits the States appropriately may punish."[16]  This was the conclusion, again of a unanimous Court, in 1940. *Cantwell* v. *Connecticut, supra,* at 310.

It may be argued, and weightily, that this legislation will not help matters; that tension and on occasion

---

[15] Chicago Commission on Race Relations, The Negro in Chicago, 122–133.

[16] The utterances here in question "are not," as a detached student of the problem has noted, "the daily grist of vituperative political debate.  Nor do they represent the frothy imaginings of lunatics, or the 'idle' gossip of a country town.  Rather, they indicate the systematic avalanche of falsehoods which are circulated concerning the various groups, classes and races which make up the countries of the western world."  Riesman, Democracy and Defamation: Control of Group Libel, 42 Col. L. Rev., at 727.  Professor Riesman continues: "Such purposeful attacks are nothing new, of course. . . .  What is new, however, is the existence of a mobile public opinion as the controlling force in politics, and the systematic manipulation of that opinion by the use of calculated falsehood and vilification."  *Id.,* at 728.

262

violence between racial and religious groups must be traced to causes more deeply embedded in our society than the rantings of modern Know-Nothings.[17] Only those lacking responsible humility will have a confident solution for problems as intractable as the frictions attributable to differences of race, color or religion. This being so, it would be out of bounds for the judiciary to deny the legislature a choice of policy, provided it is not unrelated to the problem and not forbidden by some explicit limitation on the State's power. That the legislative remedy might not in practice mitigate the evil, or might itself raise new problems, would only manifest once more the paradox of reform. It is the price to be paid for the trial-and-error inherent in legislative efforts to deal with obstinate social issues. "The science of government is the most abstruse of all sciences; if, indeed, that can be called a science which has but few fixed principles, and practically consists in little more than the exercise of a sound discretion, applied to the exigencies of the state as they arise. It is the science of experiment." *Anderson* v. *Dunn,* 6 Wheat. 204, 226. Certainly the Due Process Clause does not require the legislature to be in the vanguard of science—especially sciences as young as human ecology and cultural anthropology. See *Tigner* v. *Texas,* 310 U. S. 141, 148.

Long ago this Court recognized that the economic rights of an individual may depend for the effectiveness of their enforcement on rights in the group, even though not formally corporate, to which he belongs. *American Foundries* v. *Tri-City Council,* 257 U. S. 184. Such group-protection on behalf of the individual may, for all we know, be a need not confined to the part that a trade union plays in effectuating rights abstractly recognized as belonging

---

[17] See, *e. g.,* L. Hand, J., in a symposium in The Saturday Review of Literature, Mar. 15, 1947, pp. 23–24; Report of the Committee on the Law of Defamation, Cmd. 7536, 11 (1948).

to its members. It is not within our competence to con-
firm or deny claims of social scientists as to the depend-
ence of the individual on the position of his racial or re-
ligious group in the community. It would, however, be
arrant dogmatism, quite outside the scope of our authority
in passing on the powers of a State, for us to deny that
the Illinois legislature may warrantably believe that a
man's job and his educational opportunities and the dig-
nity accorded him may depend as much on the reputation
of the racial and religious group to which he willy-nilly
belongs, as on his own merits. This being so, we are
precluded from saying that speech concededly punish-
able when immediately directed at individuals cannot be
outlawed if directed at groups with whose position and
esteem in society the affiliated individual may be inex-
tricably involved.

We are warned that the choice open to the Illinois
legislature here may be abused, that the law may be dis-
criminatorily enforced; prohibiting libel of a creed or of
a racial group, we are told, is but a step from prohibiting
libel of a political party.[18]   Every power may be abused,
but the possibility of abuse is a poor reason for denying
Illinois the power to adopt measures against criminal
libels sanctioned by centuries of Anglo-American law.
"While this Court sits" it retains and exercises authority
to nullify action which encroaches on freedom of utter-

_____

[18] It deserves emphasis that there is no such attempt in this stat-
ute.   The rubric "race, color, creed or religion" which describes the
type of group libel of which is punishable, has attained too fixed a
meaning to permit political groups to be brought within it.   If a
statute sought to outlaw libels of political parties, quite different
problems not now before us would be raised.   For one thing, the
whole doctrine of fair comment as indispensable to the democratic
political process would come into play.   See *People* v. *Fuller, supra,*
at 125, 87 N. E., at 338–339; *Commonwealth* v. *Pratt,* 208 Mass. 553,
559, 95 N. E. 105, 106.   Political parties, like public men, are, as it
were, public property.

ance under the guise of punishing libel. Of course discussion cannot be denied and the right, as well as the duty, of criticism must not be be stifled.

The scope of the statute before us, as construed by the Illinois court, disposes of the contention that the conduct prohibited by the law is so ill-defined that judges and juries in applying the statute and men in acting cannot draw from it adequate standards to guide them. The clarifying construction and fixed usage which govern the meaning of the enactment before us were not present, so the Court found, in the New York law held invalid in *Winters* v. *New York,* 333 U. S. 507. Nor, thus construed and limited, is the act so broad that the general verdict of guilty on an indictment drawn in the statutory language might have been predicated on constitutionally protected conduct. On this score, the conviction here reviewed differs from those upset in *Stromberg* v. *California,* 283 U. S. 359, *Thornhill* v. *Alabama,* 310 U. S. 88, and *Terminiello* v. *Chicago,* 337 U. S. 1. Even the latter case did not hold that the unconstitutionality of a statute is established *because* the speech prohibited by it raises a ruckus.

It is suggested that while it was clearly within the constitutional power of Illinois to punish this utterance if the proceeding were properly safeguarded, in this particular case Illinois denied the defendant rights which the Due Process Clause commands. Specifically, it is argued that the defendant was not permitted to raise at the trial defenses constitutionally guaranteed in a criminal libel prosecution: (1) the defense of truth; (2) justification of the utterance as "fair comment"; and (3) its privilege as a means for redressing grievances.

Neither by proffer of evidence, requests for instructions, nor motion before or after verdict did the defendant seek to justify his utterance as "fair comment" or as privileged. Nor has the defendant urged as a ground for reversing his

conviction in this Court that his opportunity to make those defenses was denied below. And so, whether a prosecution for libel of a racial or religious group is unconstitutionally invalid where the State did deny the defendant such opportunities is not before us.[19] Certainly the State may cast the burden of justifying what is patent defamation upon the defamer. The benefits of hypothetical defenses, never raised below or pressed upon us, are not to be invoked in the abstract.

As to the defense of truth, Illinois in common with many States requires a showing not only that the utterance state the facts, but also that the publication be made "with good motives and for justifiable ends." Ill. Const., Art. II, § 4.[20] Both elements are necessary if the defense is to prevail. What has been called "the common sense of American criminal law," as formulated, with regard to necessary safeguards in criminal libel prosecutions, in the New York Constitution of 1821, Art. VII, § 8, has been adopted in terms by Illinois. The teaching of a century and a half of criminal libel prosecutions in this country

[19] Indeed, such defenses are evidently protected by Illinois law. See Ill. Const., Art. II, § 17, guaranteeing the right of the people to apply for redress of grievances. And see *People* v. *Fuller,* 238 Ill. 116, 125, 87 N. E. 336, 338–339, on the defense of "fair comment" in criminal libel prosecutions.

[20] The present constitution, adopted in 1870, is Illinois' third. The first two preserved the defense of truth in certain types of libel prosecutions: "In prosecutions for the publication of papers investigating the official conduct of officers, or of men acting in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right of determining both the law and the fact under the direction of the court as in other cases." Ill. Const., 1818, Art. VIII, § 23; Ill. Const., 1848, Art. XIII, § 24. The combined requirement of truth and good motives and justifiable ends, available as a defense in all libel suits, was adopted with the Constitution of 1870.

would go by the board if we were to hold that Illinois was not within her rights in making this combined requirement. Assuming that defendant's offer of proof directed to a part of the defense was adequate,[21] it did not satisfy the entire requirement which Illinois could exact.[22]

Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase "clear and present danger." Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of such circumstances. Libel, as we have seen, is in the same class.

We find no warrant in the Constitution for denying to Illinois the power to pass the law here under attack.[23] But

---

[21] Defendant offered to show (1) that crimes were more frequent in districts heavily populated by Negroes than in those where whites predominated; (2) three specific crimes allegedly committed by Negroes; and (3) that property values declined when Negroes moved into a neighborhood. It is doubtful whether such a showing is as extensive as the defamatory allegations in the lithograph circulated by the defendant.

[22] The defense attorney put a few questions to the defendant on the witness stand which tended toward elaborating his motives in circulating the lithograph complained of. When objections to these questions were sustained, no offer of proof was made, in contrast to the rather elaborate offer which followed the refusal to permit questioning tending to show the truth of the matter. Indeed, in that offer itself, despite its considerable detail, no mention was made of the necessary element of good motive or justifiable ends. In any event, the question of exclusion of this testimony going to motive was not raised by motion in the trial court, on appeal in Illinois, or before us.

[23] The law struck down by the New Jersey court in *New Jersey* v. *Klapprott*, 127 N. J. L. 395, 22 A. 2d 877, was quite different than the one before us and was not limited, as is the Illinois statute, by construction or usage. Indeed, in that case the court emphasized that "It is not a case of libel," and contrasted the history at common law of criminal prosecutions for written and spoken defamation.

it bears repeating—although it should not—that our finding that the law is not constitutionally objectionable carries no implication of approval of the wisdom of the legislation or of its efficacy. These questions may raise doubts in our minds as well as in others. It is not for us, however, to make the legislative judgment. We are not at liberty to erect those doubts into fundamental law.

*Affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

This case is here because Illinois inflicted criminal punishment on Beauharnais for causing the distribution of leaflets in the city of Chicago. The conviction rests on the leaflet's contents, not on the time, manner or place of distribution. Beauharnais is head of an organization that opposes amalgamation and favors segregation of white and colored people. After discussion, an assembly of his group decided to petition the mayor and council of Chicago to pass laws for segregation. Volunteer members of the group agreed to stand on street corners, solicit signers to petitions addressed to the city authorities, and distribute leaflets giving information about the group, its beliefs and its plans. In carrying out this program a solicitor handed out a leaflet which was the basis of this prosecution. Since the Court opinion quotes only parts of the leaflet, I am including all of it as an appendix to this dissent, *post,* p. 276.

I.

That Beauharnais and his group were making a genuine effort to petition their elected representatives is not disputed. Even as far back as 1689, the Bill of Rights exacted of William & Mary said: "It is the Right of the Subjects to petition the King, and all Commitments and

Prosecutions for such petitioning are illegal." [1]  And 178 years ago the Declaration of Rights of the Continental Congress proclaimed to the monarch of that day that his American subjects had "a right peaceably to assemble, consider of their grievances, and petition the King; and that all prosecutions, prohibitory proclamations, and commitments for the same, are illegal." [2]  After independence was won, Americans stated as the first unequivocal command of their Bill of Rights: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Without distortion, this First Amendment could not possibly be read so as to hold that Congress has power to punish Beauharnais and others for petitioning Congress as they have here sought to petition the Chicago authorities. See *e. g., Bridges* v. *California,* 314 U. S. 252, 277.  And we have held in a number of prior cases that the Fourteenth Amendment makes the specific prohibitions of the First Amendment equally applicable to the states.[3]

In view of these prior holdings, how does the Court justify its holding today that states can punish people for exercising the vital freedoms intended to be safeguarded from suppression by the First Amendment?  The prior holdings are not referred to; the Court simply acts on the bland assumption that the First Amendment is wholly irrelevant.  It is not even accorded the respect of a passing mention.  This follows logically, I suppose,

---

[1] 1 William & Mary, Sess. 2, c. 2 (1689).

[2] Eighth Resolution of the Continental Congress of 1774.

[3] *E. g., Grosjean* v. *American Press Co.,* 297 U. S. 233, 244, 245, 249; *Lovell* v. *Griffin,* 303 U. S. 444, 450; *Schneider* v. *State,* 308 U. S. 147, 160; *Thornhill* v. *Alabama,* 310 U. S. 88, 95; *Minersville District* v. *Gobitis,* 310 U. S. 586, 593; *Board of Education* v. *Barnette,* 319 U. S. 624, 639; *Thomas* v. *Collins,* 323 U. S. 516, 529–530, concurring opinion, 545; *Pennekamp* v. *Florida,* 328 U. S. 331, 349.

from recent constitutional doctrine which appears to measure state laws solely by this Court's notions of civilized "canons of decency," reasonableness, etc. See, *e. g.*, *Rochin* v. *California,* 342 U. S. 165, 169. Under this "reasonableness" test, state laws abridging First Amendment freedoms are sustained if found to have a "rational basis." But in *Board of Education* v. *Barnette,* 319 U. S. 624, 639, we said:

> "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds."

Today's case degrades First Amendment freedoms to the "rational basis" level. It is now a certainty that the new "due process" coverall offers far less protection to liberty than would adherence to our former cases compelling states to abide by the unequivocal First Amendment command that its defined freedoms shall not be abridged. The Court's holding here and the constitutional doctrine behind it leave the rights of assembly, petition,

speech and press almost completely at the mercy of state legislative, executive, and judicial agencies. I say "almost" because state curtailment of these freedoms may still be invalidated if a majority of this Court conclude that a particular infringement is "without reason," or is "a wilful and purposeless restriction unrelated to the peace and well being of the State." But lest this encouragement should give too much hope as to how and when this Court might protect these basic freedoms from state invasion, we are cautioned that state legislatures must be left free to "experiment" and to make "legislative" judgments. We are told that mistakes may be made during the legislative process of curbing public opinion. In such event the Court fortunately does not leave those mistakenly curbed, or any of us for that matter, unadvised. Consolation can be sought and must be found in the philosophical reflection that state legislative error in stifling speech and press "is the price to be paid for the trial-and-error inherent in legislative efforts to deal with obstinate social issues." My own belief is that no legislature is charged with the duty or vested with the power to decide what public issues Americans can discuss. In a free country that is the individual's choice, not the state's. State experimentation in curbing freedom of expression is startling and frightening doctrine in a country dedicated to self-government by its people. I reject the holding that either state or nation can punish people for having their say in matters of public concern.

## II.

The Illinois statute upheld by the Court makes it a crime:

1. for "any person, firm or corporation,"

2. to "manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place,"

3. any "lithograph [construed to include any printed matter], moving picture, play, drama or sketch,"

4. which portrays "depravity, criminality, unchastity, or lack of virtue,"

5. of "a class of citizens, of any race, color, creed or religion,"

6. and exposes such a class to "contempt, derision, or obloquy,"

7. *or* "is productive of breach of the peace or riots."

This statute imposes state censorship over the theater, moving pictures, radio, television, leaflets, magazines, books and newspapers. No doubt the statute is broad enough to make criminal the "publication, sale, presentation or exhibition" of many of the world's great classics, both secular and religious.

The Court condones this expansive state censorship by painstakingly analogizing it to the law of criminal libel. As a result of this refined analysis, the Illinois statute emerges labeled a "group libel law." This label may make the Court's holding more palatable for those who sustain it, but the sugar-coating does not make the censorship less deadly. However tagged, the Illinois law is not that criminal libel which has been "defined, limited and constitutionally recognized time out of mind." [4] For as

---

[4] The Court's finding of a close kinship between "criminal libel" and "group libel" because both contain the word "libel" and have some factors in common is reminiscent of what Earl Stanhope said in 1792 in discussing Mr. Fox's Libel Bill. He was arguing that a jury of laymen might more likely protect liberty than judges, because judges were prone to rely too heavily on word books. "He put the case, that an action for a libel was brought for using a modern word, not to be found in any grammar or glossary, viz. for saying that a man was 'a great bore;' a jury would laugh at such a ground of prosecution, but the judges would turn to their grammars and glossaries, and

"constitutionally recognized" that crime has provided for punishment of false, malicious, scurrilous charges against individuals, not against huge groups. This limited scope of the law of criminal libel is of no small importance. It has confined state punishment of speech and expression to the narrowest of areas involving nothing more than purely private feuds. Every expansion of the law of criminal libel so as to punish discussions of matters of public concern means a corresponding invasion of the area dedicated to free expression by the First Amendment.

Prior efforts to expand the scope of criminal libel beyond its traditional boundaries have not usually met with widespread popular acclaim. "Seditious libel" was such an expansion and it did have its day, particularly in the English Court of Star Chamber. But the First Amendment repudiated seditious libel for this country. And one need only glance through the parliamentary discussion of Fox's Libel Law passed in England in 1792, to sense the bad odor of criminal libel in that country even when confined to charges against individuals only.

The Court's reliance on *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, is also misplaced. New Hampshire had a state law making it an offense to direct insulting words at an *individual* on a public street. Chaplinsky had violated that law by calling a man vile names "face-to-face." We pointed out in that context that the use of such "fighting" words was not an essential part of exposition of ideas. Whether the words used in their context here are "fighting" words in the same sense is doubtful, but whether so or

---

not being able to meet with it, would say they could not find such a phrase as 'a great bore,' but they had found a wild boar, which no doubt it meant; and yet it could not be, as a wild boar had four legs, and a man was a two legged animal; then it must mean, that the plaintiff was like a wild boar in disposition, which was a wicked libel, and therefore let the defendant be hanged." 29 Hansard, Parliamentary History of England, p. 1412.

not they are not addressed to or about *individuals*. Moreover, the leaflet used here was also the means adopted by an assembled group to enlist interest in their efforts to have legislation enacted. And the fighting words were but a part of arguments on questions of wide public interest and importance. Freedom of petition, assembly, speech and press could be greatly abridged by a practice of meticulously scrutinizing every editorial, speech, sermon or other printed matter to extract two or three naughty words on which to hang charges of "group libel." The *Chaplinsky* case makes no such broad inroads on First Amendment freedoms. Nothing Mr. Justice Murphy wrote for the Court in that case or in any other case justifies any such inference.

Unless I misread history the majority is giving libel a more expansive scope and more respectable status than it was ever accorded even in the Star Chamber. For here it is held to be punishable to give publicity to any picture, moving picture, play, drama or sketch, or any printed matter which a judge may find unduly offensive to any race, color, creed or religion. In other words, in arguing for or against the enactment of laws that may differently affect huge groups, it is now very dangerous indeed to say something critical of one of the groups. And any "person, firm or corporation" can be tried for this crime. "Person, firm or corporation" certainly includes a book publisher, newspaper, radio or television station, candidate or even a preacher.

It is easy enough to say that none of this latter group have been proceeded against under the Illinois Act. And they have not—yet. But emotions bubble and tempers flare in racial and religious controversies, the kind here involved. It would not be easy for any court, in good conscience, to narrow this Act so as to exclude from it any of those I have mentioned. Furthermore, persons tried under the Act could not even get a jury trial except

274

as to the bare fact of publication. Here, the court simply charged the jury that Beauharnais was guilty if he had caused distribution of the leaflet. Such trial by judge rather than by jury was outlawed in England in 1792 by Fox's Libel Law.

This Act sets up a system of state censorship which is at war with the kind of free government envisioned by those who forced adoption of our Bill of Rights. The motives behind the state law may have been to do good. But the same can be said about most laws making opinions punishable as crimes. History indicates that urges to do good have led to the burning of books and even to the burning of "witches."

No rationalization on a purely legal level can conceal the fact that state laws like this one present a constant overhanging threat to freedom of speech, press and religion. Today Beauharnais is punished for publicly expressing strong views in favor of segregation. Ironically enough, Beauharnais, convicted of crime in Chicago, would probably be given a hero's reception in many other localities, if not in some parts of Chicago itself. Moreover, the same kind of state law that makes Beauharnais a criminal for advocating segregation in Illinois can be utilized to send people to jail in other states for advocating equality and nonsegregation. What Beauharnais said in his leaflet is mild compared with usual arguments on both sides of racial controversies.

We are told that freedom of petition and discussion are in no danger "while this Court sits." This case raises considerable doubt. Since those who peacefully petition for changes in the law are not to be protected "while this Court sits," who is? I do not agree that the Constitution leaves freedom of petition, assembly, speech, press or worship at the mercy of a case-by-case, day-by-day majority of this Court. I had supposed that our people could rely for their freedom on the Constitution's commands, rather

than on the grace of this Court on an individual case basis. To say that a legislative body can, with this Court's approval, make it a crime to petition for and publicly discuss proposed legislation seems as farfetched to me as it would be to say that a valid law could be enacted to punish a candidate for President for telling the people his views. I think the First Amendment, with the Fourteenth, "absolutely" forbids such laws without any "ifs" or "buts" or "whereases." Whatever the danger, if any, in such public discussions, it is a danger the Founders deemed outweighed by the danger incident to the stifling of thought and speech. The Court does not act on this view of the Founders. It calculates what it deems to be the danger of public discussion, holds the scales are tipped on the side of state suppression, and upholds state censorship. This method of decision offers little protection to First Amendment liberties "while this Court sits."

If there be minority groups who hail this holding as their victory, they might consider the possible relevancy of this ancient remark:

"Another such victory and I am undone."

[For appendix to opinion of MR. JUSTICE BLACK, see *post*, p. 276.]

[For dissenting opinion of MR. JUSTICE REED, see *post*, p. 277.]

[For dissenting opinion of MR. JUSTICE DOUGLAS, see *post*, p. 284.]

[For dissenting opinion of MR. JUSTICE JACKSON, see *post*, p. 287.]

276

APPENDIX TO OPINION OF MR. JUSTICE BLACK.

PEOPLES EXHIBIT 3

# PRESERVE and PROTECT
# WHITE NEIGHBORHOODS!

### FROM THE CONSTANT AND CONTINUOUS INVASION, HARASSMENT AND ENCROACHMENT BY THE NEGROES

#### (WE WANT TWO MILLION SIGNATURES OF WHITE MEN AND WOMEN)

PETITION
To The Honorable Martin H. Kennelly
and City Council of the City of Chicago.

WHEREAS, the white population of the City of Chicago, particularly on the South Side of said city, are seething, nervous and agitated because of the constant and continuous invasion, harassment and encroachment by the Negroes upon them, their property and neighborhoods and —

WHEREAS, there have been disastrous incidents within the past year, all of which are fraught with grave consequences and great danger to the Peace and Security of the people, and

WHEREAS, there is great danger to the Government from communism which is rife among the Negroes, and
WHEREAS, we are not against the negro; we are for the white people and the white people are entitled to protection: —

We, the undersigned white citizens of the City of Chicago and the State of Illinois, hereby petition the Honorable Martin H. Kennelly, Mayor of the City of Chicago and the Alderman of the City of Chicago, to halt the further encroachment, harassment and invasion of white people, their property, neighborhoods and persons, by the Negro — through the exercise of the Police Power; of the Office of the Mayor of the City of Chicago, and the City Council.

#### WANTED

ONE MILLION SELF RESPECTING WHITE PEOPLE IN CHICAGO TO UNITE UNDER THE BANNER OF THE WHITE CIRCLE LEAGUE OF AMERICA to oppose the National Campaign now on and supported by TRUMAN'S INFAMOUS CIVIL RIGHTS PROGRAM and many Pro Negro Organizations to amalgamate the black and white races with the object of mongrelizing the white race!

THE WHITE CIRCLE LEAGUE OF AMERICA is the only articulate white voice in America being raised in protest against negro agressions and infiltrations into all white neighborhoods. The white people of Chicago MUST take advantage of this opportunity to become UNITED. If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions . . . rapes, robberies, knives, guns and marijuana of the negro, SURELY WILL.

The Negro has many national organizations working to push him into the midst of the white people on many fronts. The white race does not have a single organization to work on a NATIONAL SCALE to make its wishes articulate and to assert its natural rights to self-preservation. THE WHITE CIRCLE LEAGUE OF AMERICA proposes to do the job.
WE ARE NOT AGAINST THE NEGRO! WE ARE FOR THE WHITE PEOPLE!
We must awaken and protect our white families and neighborhoods before it is too late. Let us work unceasingly to conserve the white man's dignity and rights in America.

THE WHITE CIRCLE LEAGUE OF AMERICA, INC. - Joseph Beauharnais, Pres. - FR 2-8533, Suite 808, 82 W. Washington St.
VOLUNTEERS NEEDED TO GET 25 SIGNATURES ON PETITION! COME TO HEADQUARTERS!

I wish to be enrolled as a member in THE WHITE CIRCLE LEAGUE OF AMERICA and I will do my best to secure ten (10) or more members.

THE FIRST LOYALTY OF EVERY WHITE PERSON IS TO HIS RACE. ALL THE COMBINED PRO NEGRO FORCES HAVE HURLED THEIR ULTIMATUM INTO THE FACES OF THE WHITE PEOPLE. WE ACCEPT THEIR CHALLENGE.

THEY CANNOT WIN!

IT WILL BE EASIER TO REVERSE THE CURRENT OF THE ATLANTIC OCEAN THAN TO DEGRADE THE WHITE RACE AND ITS NATURAL LAWS BY FORCED MONGRELIZATION.

THE HOUR HAS STRUCK FOR ALL NORMAL WHITE PEOPLE TO STAND UP AND FIGHT FOR OUR RIGHTS TO LIFE, LIBERTY AND THE PURSUIT OF HAPPINESS.

JOSEPH BEAUHARNAIS.

**APPLICATION FOR 1950 MEMBERSHIP**
**THE WHITE CIRCLE LEAGUE OF AMERICA, INC.**
(Not For Profit)

Mail To —
THE WHITE CIRCLE LEAGUE OF AMERICA Inc.
82 W. Washington St.
Chicago 2, Illinois
Tel. FR 2-8533

DATE... ...................................................19. ......

☐ Membership ...... ...................... .....................................$1.00
☐ Subscripton to Monthly Magazine (WHITE CIRCLE NEWS) per year .....................................$3.00
☐ Voluntary Contribution $.........................
☐ I can volunteer some of my time to aid the WHITE CIRCLE in getting under way.

(SIGNED) (Print Name) . .. ...............................................................................................
NAME ...... .. ...... . ............... ...... ... ...... ...............................................................
ADDRESS ... ....... ...................... ..................................... PHONE............................
CITY ......................... ........................................... ... STATE................. ......................
(Note: Tear Off and Mail to Headquarters wth Your Remittance)

MR. JUSTICE REED, with whom MR. JUSTICE DOUGLAS joins, dissenting.

The Fourteenth Amendment of our Constitution forbids that any person be deprived by a state of liberty or property without due process of law. This Illinois conviction subjects petitioner to a fine of $200. The petitioner challenges the validity of the sentence on the ground that his conviction under § 224a, Division 1, of the Illinois Criminal Code [1] violates substantive due process. The petition for certiorari phrases the issue thus: "Is the Illinois statute . . . as construed . . . or applied . . . invalid . . . because it infringes upon the constitutional guarantee of free speech, press and of assemblage as guaranteed" by the Fourteenth Amendment?

The Supreme Court of Illinois upheld the conviction of petitioner under an information which charged:

"that defendant on January 7, 1950, at the City of Chicago, did unlawfully publish, present and exhibit in public places, lithographs, which publications portray depravity, criminality, unchastity or lack of virtue of citizens of Negro race and color and which exposes citizens of Illinois of the Negro race and

---

[1] "It shall be unlawful for any person, firm or corporation to manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place in this state any lithograph, moving picture, play, drama or sketch, which publication or exhibition portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion which said publication or exhibition exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots. Any person, firm or corporation violating any of the provisions of this section, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than fifty dollars ($50.00), nor more than two hundred dollars ($200.00)."

color to contempt, derision, or obloquy, which more fully appears in Exhibit A, which is attached hereto and made a part thereof." [2]

The evidence was sufficient to justify the jury in finding that Beauharnais caused the lithograph referred to in the information to be published and distributed in public places. The jury did so find under certain general instructions as to the proper attitude of jurors but essentially and specifically under the following instruction:

"(1) The Court instructs the jury that if you find from the evidence that the defendant, Joseph Beauharnais, did on or about January 7, 1950 manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place the lithograph, which was allowed in evidence in this case as Peoples Exhibit Number 3, then you are to find the defendant guilty and fine him not less than $50.00 nor more than $200.00."

Thus, the judge did not leave to the jury but decided himself, doubtless as a matter of law, that the publication of the lithograph violated the statute. No complaint was made of this state method of trial.

At trial, petitioner filed a motion to quash the information and objected to the above specific instruction. He also moved for a peremptory instruction of "not guilty" and for judgment notwithstanding the verdict. All these contentions were overruled by the trial court, and, although the record does not show a precisely pleaded objection to the conviction on the ground that § 224a is unconstitutional, nonetheless the Supreme Court of Illinois treated petitioner's contention that the statute was

---

[2] *People* v. *Beauharnais,* 408 Ill. 512, 514, 97 N. E. 2d 343, 344–345. The Exhibit A referred to in the information is the lithograph referred to in the instructions to the jury as People's Exhibit 3.

too vague and by virtue of that fact was so broad that it abridged free speech in violation of the Fourteenth Amendment.[3] The petition for certiorari brings these questions here.

In carrying out its obligation to conform state legal administration to the "fundamental principles of liberty and justice" imposed on the states by the Fourteenth Amendment,[4] this Court has steadily affirmed that the general principle against abridgment of free speech, protected by the First Amendment, is included in the command of the Fourteenth.[5] So important to a constitutional democracy is the right of discussion that any challenge to legislative abridgment of those privileges of a free people calls for careful judicial appraisal.[6] It is when speech becomes an incitement to crime that the right freely to exhort may be abridged. *American Communications Assn.* v. *Douds,* 339 U. S. 382, 395; *Herndon* v. *Lowry,* 301 U. S. 242, 255.

---

[3] 408 Ill. 512, at 515–516 and 517, 97 N. E. 2d 343, at 345–346. If the highest court of the state treats the federal question as properly before it, and decides the question, the question is reviewable here, regardless of the manner in which it was raised in the inferior courts of the state.   See *Whitney* v. *California,* 274 U. S. 357, 361, and cases there cited.

[4] *Hebert* v. *Louisiana,* 272 U. S. 312, 316; *Palko* v. *Connecticut,* 302 U. S. 319; *Adamson* v. *California,* 332 U. S. 46, 66.

[5] *Gitlow* v. *New York,* 268 U. S. 652, 666, 672; *Near* v. *Minnesota,* 283 U. S. 697, 707; *Pennekamp* v. *Florida,* 328 U. S. 331, 335.

[6] *De Jonge* v. *Oregon,* 299 U. S. 353, 365:

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means.   Therein lies the security of the Republic, the very foundation of constitutional government."

When a state conviction is challenged here on the ground that free speech has been abridged, this Court must first decide whether the portion of the statute upon which the charge is based is so broad "as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech." *Winters* v. *New York*, 333 U. S. 507, 509. In the *Winters* case we set aside the conviction because the indefinite character of the statutory language, as construed by the Court of Appeals of New York, was so broad that protected speech was prohibited. This Court reversed, even though it assumed that Winters' conduct could constitutionally be punished by a statute expressing its prohibitions in reasonably narrow and definite form.[7]

This requirement means that when the verdict and judgment flow, as here, from the information as a whole, each and every portion of the statute upon which the information was drawn must be constitutional. In *Stromberg* v. *California*, 283 U. S. 359, Stromberg had been convicted in the California courts for violating a statute of that state forbidding the display of a red flag.[8] On appeal, this Court did not consider whether Stromberg's conduct, as shown by the record, was protected by the Constitution. Instead, despite the fact that the second and third clauses of the California statute were unquestionably valid under the Federal Constitution, this Court

[7] See 333 U. S., at 520. Cf. *Thornhill* v. *Alabama*, 310 U. S. 88; *Herndon* v. *Lowry*, 301 U. S. 242, 263–264.

[8] 283 U. S., at 361:

"Any person who displays a red flag, banner or badge or any flag, badge, banner, or device of any color or form whatever in any public place or in any meeting place or public assembly, or from or on any house, building or window as a sign, symbol or emblem of opposition to organized government or as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character is guilty of a felony." Then § 403a of the Calif. Penal Code.

reversed the state court because its conviction of Strom-
berg might have been based upon the first clause, holding
that "if any of the clauses in question is invalid under the
Federal Constitution, the conviction cannot be upheld." [9]
The first clause, forbidding a display of a red flag as a
symbol of opposition to organized government, was
deemed invalid because it was so broad that it permitted
"punishment of the fair use of [the] opportunity [for free
political discussion, and was therefore] repugnant to the
guaranty of liberty contained in the Fourteenth Amend-
ment." *Id.* at 369.

The judgment in this present case followed from a de-
termination of judge and jury that petitioner's publica-
tion of the lithograph violated the statute. From the
general verdict of guilty, nothing appears to show what
particular words of the statute the Illinois courts deter-
mined the lithograph offended. This conviction must
stand or fall upon a determination whether all definitions
of the acts proscribed by the statute and charged in the
information may be banned under the principles of the
First Amendment, for, as the foregoing discussion shows,
it is impossible to tell upon what phrase of the statute
petitioner's conviction was based. Our examination can
begin and end with the inquiry as to what meaning lies
in the act's declaration, as charged in the information,
that it is unlawful to portray in a lithograph a "lack of
virtue of a class of citizens . . . which . . . exposes
[them to] derision, or obloquy."

The majority opinion asserts that Illinois has given
sufficiently clear and narrow meaning to the words
"virtue," "derision" and "obloquy" by characterizing
§ 224a as "a form of criminal libel law." But the mere
description of this statute as a criminal libel law does not

---

[9] 283 U. S. at 368. See also *Williams* v. *North Carolina,* 317 U. S.
287, 291–292. Cf. *Thomas* v. *Collins,* 323 U. S. 516, 529; *Cramer* v.
*United States,* 325 U. S. 1, 36, n. 45.

clarify the meaning of these vague words in the statute. To say that the mere presence of the word "virtue" in the individual libel statute [10] makes its meaning clear in the group libel statute is a *non sequitur*. No case is cited which defines and limits the meaning of these words. Reliance is also placed by the Court upon Illinois' unfortunate experience with clashes between races. How that experience gives content to the vague words is not explained. The opinion further relies upon "the *clarifying construction* and *fixed usage* which govern the meaning of the enactment before us." (Emphasis added.) No opinions containing such clarification are cited. In addition to the case before us, we find only two reported adjudications on § 224a in the Illinois courts.[11] Without caviling that one of these cases is so recent that it follows the instant case in the reports, certainly neither of them contains any words which give that "clarifying construction" claimed for Illinois law.

The majority certainly do not supply that construction by intimating that the publications prohibited by § 224a are only those "liable to cause violence and disorder." Moreover, that phrase was used by the Illinois court, not to limit the prohibition of § 224a, but to describe the lithograph published by Beauharnais. See 408 Ill., at 517, 97 N. E. 2d, at 346. The quoted language does not limit the statutory words "virtue," "derision" or "obloquy." [12]

---

[10] Smith-Hurd Ill. Ann. Stat., 1936, c. 38, § 402, quoted in majority opinion at n. 5.

[11] *People* v. *Simcox,* 379 Ill. 347, 40 N. E. 2d 525; *People* v. *White Circle League,* 408 Ill. 564, 97 N. E. 2d 811 (1951). See also *Fox Film Corp.* v. *Collins,* 236 Ill. App. 281; *Bevins* v. *Prindable,* 39 F. Supp. 708, aff'd 314 U. S. 573.

[12] Indeed, if the Illinois courts had been inclined to interpret their statute as this Court now interprets it, they could have done so only by reading out of their statute the disjunctive clause "or which

The Court speaks at length of the constitutional power of a state to pass group libel laws to protect the public peace. This dissent assumes that power. What is under discussion is whether the conviction of Beauharnais on a general charge of violation of the statute can stand when the statute contains without statutory or judicial definition words of such ambiguous meaning and uncertain connotation as "virtue," "derision," or "obloquy." The Court does not attempt to speak specifically as to that contention.

The importance of a definite ruling on that point is manifest. Racial, religious, and political biases and prejudices lead to charge and countercharge, acrimony and bitterness. If words are to be punished criminally, the Constitution at least requires that only words or expressions or statements that can be reasonably well defined, or that have through long usage an accepted meaning, shall furnish a basis for conviction.[13]

These words—"virtue," "derision," and "obloquy"— have neither general nor special meanings well enough known to apprise those within their reach as to limita-

---

is productive of breach of the peace or riots." (Quoted at p. 251 of majority opinion.) If the Illinois courts were inclined to read this disjunctive as a conjunctive, they would presumably have reversed Beauharnais' conviction, for the information in this case did not charge that publication of his lithograph would be productive of breach of the peace or riots.

[13] ". . . the constitution never intended to invest judges with a discretion which cannot be tried and measured by the plain and palpable standard of law . . . . On a special verdict for murder, the life of the prisoner does not depend upon the religious, moral, or philosophical ideas of the judges . . . . [I]f he is condemned . . . his conduct is brought to a precise, clear, intelligible standard, and cautiously measured by it: it is the law, therefore, and not the judge, which condemns him. . . ."

Argument in the King's Bench in the Dean of St. Asaph's case (1783–1784). 21 Howell's State Trials 847, 1006.

tions on speech. Compare *Connally* v. *General Construction Co.*, 269 U. S. 385, 391–392. Philosophers and poets, thinkers of high and low degree from every age and race have sought to expound the meaning of virtue, but each teaches his own conception of the moral excellence that satisfies standards of good conduct. Are the tests of the Puritan or the Cavalier to be applied, those of the city or the farm, the Christian or non-Christian, the old or the young? Does the Bill of Rights permit Illinois to forbid any reflection on the virtue of racial or religious classes which a jury or a judge may think exposes them to derision or obloquy, words themselves of quite uncertain meaning as used in the statute? I think not. A general and equal enforcement of this law would restrain the mildest expressions of opinion in all those areas where "virtue" may be thought to have a role. Since this judgment may rest upon these vague and undefined words, which permit within their scope the punishment of incidents secured by the guarantee of free speech, the conviction should be reversed.

MR. JUSTICE DOUGLAS, dissenting.

Hitler and his Nazis showed how evil a conspiracy could be which was aimed at destroying a race by exposing it to contempt, derision, and obloquy. I would be willing to concede that such conduct directed at a race or group in this country could be made an indictable offense. For such a project would be more than the exercise of free speech. Like picketing, it would be free speech plus.

I would also be willing to concede that even without the element of conspiracy there might be times and occasions when the legislative or executive branch might call a halt to inflammatory talk, such as the shouting of "fire" in a school or a theatre.

My view is that if in any case other public interests are to override the plain command of the First Amendment,

the peril of speech must be clear and present, leaving no room for argument, raising no doubts as to the necessity of curbing speech in order to prevent disaster.

The First Amendment is couched in absolute terms—freedom of speech shall not be abridged. Speech has therefore a preferred position [1] as contrasted to some other civil rights. For example, privacy, equally sacred to some, is protected by the Fourth Amendment only against unreasonable searches and seizures. There is room for regulation of the ways and means of invading privacy. No such leeway is granted the invasion of the right of free speech guaranteed by the First Amendment. Until recent years that had been the course and direction of constitutional law. Yet recently the Court in this and in other cases [2] has engrafted the right of regulation onto the First Amendment by placing in the hands of the legislative branch the right to regulate "within reasonable limits" the right of free speech. This to me is an ominous and alarming trend. The free trade in ideas which the Framers of the Constitution visualized disappears. In its place there is substituted a new orthodoxy—an orthodoxy that changes with the whims of the age or the day, an orthodoxy which the majority by solemn judgment proclaims to be essential to the safety, welfare, security, morality, or health of society. Free speech in the constitutional sense disappears. Limits are drawn—limits dictated by expediency, political opinion, prejudices or some other desideratum of legislative action.

An historic aspect of the issue of judicial supremacy was the extent to which legislative judgment would be

---

[1] *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115; *Thomas* v. *Collins,* 323 U. S. 516, 530; *Saia* v. *New York,* 334 U. S. 558, 561.

[2] *Dennis* v. *United States,* 341 U. S. 494; *Feiner* v. *New York,* 340 U. S. 315. Cf. *Breard* v. *Alexandria,* 341 U. S. 622; *American Communications Assn.* v. *Douds,* 339 U. S. 382; *Osman* v. *Douds,* 339 U. S. 846.

supreme in the field of social legislation. The vague contours of the Due Process Clause were used to strike down laws deemed by the Court to be unwise and improvident.[3] That trend has been reversed. In matters relating to business, finance, industrial and labor conditions, health and the public welfare, great leeway is now granted the legislature,[4] for there is no guarantee in the Constitution that the *status quo* will be preserved against regulation by government. Freedom of speech, however, rests on a different constitutional basis. The First Amendment says that freedom of speech, freedom of press, and the free exercise of religion shall not be abridged. That is a negation of power on the part of each and every department of government. Free speech, free press, free exercise of religion are placed separate and apart; they are above and beyond the police power; they are not subject to regulation in the manner of factories, slums, apartment houses, production of oil, and the like.

The Court in this and in other cases places speech under an expanding legislative control. Today a white man stands convicted for protesting in unseemly language against our decisions invalidating restrictive covenants. Tomorrow a Negro will be haled before a court for denouncing lynch law in heated terms. Farm laborers in the West who compete with field hands drifting up from Mexico; whites who feel the pressure of orientals; a minority which finds employment going to members of the dominant religious group—all of these are caught in the mesh of today's decision. Debate and argument even in the courtroom are not always calm and dispassionate. Emotions sway speakers and audiences alike. Intem-

---

[3] *Lochner* v. *New York,* 198 U. S. 45; *Coppage* v. *Kansas,* 236 U. S. 1; *Ribnik* v. *McBride,* 277 U. S. 350.

[4] *Nebbia* v. *New York,* 291 U. S. 502; *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525; *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421.

perate speech is a distinctive characteristic of man. Hotheads blow off and release destructive energy in the process. They shout and rave, exaggerating weaknesses, magnifying error, viewing with alarm. So it has been from the beginning; and so it will be throughout time. The Framers of the Constitution knew human nature as well as we do. They too had lived in dangerous days; they too knew the suffocating influence of orthodoxy and standardized thought. They weighed the compulsions for restrained speech and thought against the abuses of liberty. They chose liberty. That should be our choice today no matter how distasteful to us the pamphlet of Beauharnais may be. It is true that this is only one decision which may later be distinguished or confined to narrow limits. But it represents a philosophy at war with the First Amendment—a constitutional interpretation which puts free speech under the legislative thumb. It reflects an influence moving ever deeper into our society. It is notice to the legislatures that they have the power to control unpopular blocs. It is a warning to every minority that when the Constitution guarantees free speech it does not mean what it says.

MR. JUSTICE JACKSON, dissenting.

An Illinois Act, construed by its Supreme Court to be a "group libel" statute, has been used to punish criminally the author and distributor of an obnoxious leaflet attacking the Negro race. He answers that, as applied, the Act denies a liberty secured to him by the Due Process Clause of the Fourteenth Amendment. What is the liberty which that clause underwrites?

The spectrum of views expressed by my seniors shows that disagreement as to the scope and effect of this Amendment underlies this, as it has many another, division of the Court. All agree that the Fourteenth Amendment does confine the power of the State to make printed

words criminal. Whence we are to derive metes and bounds of the state power is a subject to the confusion of which, I regret to say, I have contributed—comforted in the acknowledgment, however, by recalling that this Amendment is so enigmatic and abstruse that judges more experienced than I have had to reverse themselves as to its effect on state power.

The assumption of other dissents is that the "liberty" which the Due Process Clause of the Fourteenth Amendment protects against denial by the States is the literal and identical "freedom of speech or of the press" which the First Amendment forbids only Congress to abridge. The history of criminal libel in America convinces me that the Fourteenth Amendment did not "incorporate" the First, that the powers of Congress and of the States over this subject are not of the same dimensions, and that because Congress probably could not enact this law it does not follow that the States may not.

## I.

As a limitation upon power to punish written or spoken words, Fourteenth Amendment "liberty" in its context of state powers and functions has meant and should mean something quite different from "freedom" in its context of federal powers and functions.[1]

This Court has never sustained a federal criminal libel Act. One section of the Sedition Act of 1798 was close to being a "group libel" Act.[2] While there were convictions

---

[1] First Amendment: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." Fourteenth Amendment: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

[2] 1 Stat. 596 (1798) § 2: *"And be it further enacted,* That if any person shall write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress of the United States,

under it, no attack on its validity reached this Court. I think today's better opinion regards the enactment as a breach of the First Amendment and certainly Mr. Justice Holmes and Mr. Justice Brandeis thought so.[3] But even in the absence of judicial condemnation, the political disapproval of the Sedition Act was so emphatic and sustained that federal prosecution of the press ceased for a century. It was resumed with indictment of The Indianapolis News and The New York World for disclosures and criticisms of the Panama Canal acquisition. Both were indicted in the District of Columbia and under the District Code, on the ground that some copies circulated there. That prosecution collapsed when Judge Anderson refused the Government's application to remove the Indiana defendants to the District of Columbia for trial.[4]

The World, circulated at West Point, was indicted in New York on the theory that an 1825 Act to pro-

---

or the President of the United States, with intent to defame the said government, or either house of the said Congress, or the said President, or to bring them, or either of them, into contempt or disrepute . . . such person . . . shall be punished by a fine not exceeding two thousand dollars, and by imprisonment not exceeding two years." Section 3: ". . . it shall be lawful for the defendant . . . to give in evidence in his defence, the truth of the matter contained in the publication charged as a libel. And the jury who shall try the cause, shall have a right to determine the law and the fact, under the direction of the court, as in other cases."

[3] *Abrams* v. *United States,* 250 U. S. 616, 630.

[4] *United States* v. *Smith,* 173 F. 227. In discharging the defendants, Judge Anderson said:

"To my mind that man has read the history of our institutions to little purpose who does not look with grave apprehension upon the possibility of the success of a proceeding such as this. If the history of liberty means anything, if constitutional guaranties are worth anything, this proceeding must fail.

"If the prosecuting officers have the authority to select the tribunal, if there be more than one tribunal to select from, if the

tect fortifications assimilated the New York State law punishing criminal libel. That venture likewise came to grief when Judge Hough rejected that construction of the federal statute and was upheld by this Court. *United States* v. *Press Publishing Co.,* 219 U. S. 1 (1911). While there has been a demand from official sources for a resumption of criminal libel prosecution, it has not been acceded to.[5] Thus, while the jeopardy of such federal prosecutions has never been removed by any decision of this Court, I should think the validity of a federal enactment such as this would be extremely doubtful, to say the least.

The effect of the First Amendment on congressional power to make seditious utterance criminal did receive consideration in the aftermath of the First World War. In such a case, Mr. Justice Holmes formulated for the Court as "the question in every case" the "clear and present danger" test. *Schenck* v. *United States,* 249 U. S. 47, 52. He and Mr. Justice Brandeis adhered to it as a "rule of reason," dissenting when they thought the rest of the Court apostate. *Abrams* v. *United States,* 250 U. S. 616, 627, 628; *Schaefer* v. *United States,* 251 U. S. 466, 482.

Only after research and deliberation in these cases had sharpened their perception did these Justices face the free-speech issue as to state power which Mr. Justice Holmes first adverted to, but left undecided, in *Patterson* v. *Colorado,* 205 U. S. 454. In 1922 they joined the Court's first decision on the subject, which declared that ". . . neither the Fourteenth Amendment nor any other provision of

government has that power, and can drag citizens from distant states to the capital of the nation, there to be tried, then, as Judge Cooley says, this is a strange result of a revolution where one of the grievances complained of was the assertion of the right to send parties abroad for trial." 173 F., at 232.

[5] Riesman, Group Libel, 42 Col. L. Rev. 727, 748. See also 87 Cong. Rec. 5830–5841.

the Constitution of the United States imposes upon the States any restrictions about 'freedom of speech' . . . ." *Prudential Insurance Co.* v. *Cheek,* 259 U. S. 530, 543.

However, these two Justices, who made the only original contribution to legal thought on the difficult problems bound up in these Amendments, soon reversed and took the view that the Fourteenth Amendment did impose some restrictions upon the States. But it was not premised upon the First Amendment nor upon any theory that it was incorporated in the Fourteenth. What they wrote, with care and circumspection, I accept as the wise and historically correct view of the Fourteenth Amendment. It was:

> *"The general principle of free speech,* it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, *although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress* by the sweeping language that governs or ought to govern the laws of the United States." (Emphasis supplied.) *Gitlow* v. *New York,* 268 U. S. 652, 672.

That reasoning was echoed so recently as 1937, when the Court explicitly rejected the theory of incorporation and, through Mr. Justice Cardozo, announced a view, unanimous except for Mr. Justice Butler, that the Fourteenth did not deflect against the States the literal language of amendments designed to circumscribe federal power but qualified state power only by such general restraints as are essential to "the concept of ordered liberty." *Palko* v. *Connecticut,* 302 U. S. 319, 324–325.

It is clear that these do not proscribe state criminal libel Acts. Justices Holmes and Brandeis in 1931 joined Chief Justice Hughes, who spoke for the Court, in striking down a state Act because it authorized restraint by injunction

previous to publication. He said: "For whatever wrong the appellant has committed or may commit, by his publications, the State appropriately affords both public and private redress by its libel laws." This was amplified: "But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common law rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our constitutions. . . . The law of criminal libel rests upon that secure foundation." *Near* v. *Minnesota,* 283 U. S. 697, 715.

So recently as 1942, a unanimous Court, speaking of state power, said that punishment of libelous words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace" has never been thought to raise any constitutional problem. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572.

More than forty State Constitutions, while extending broad protections to speech and press, reserve a responsibility for their abuse and implicitly or explicitly recognize validity of criminal libel laws.[6] We are justified

---

[6] The following is a list of such state constitutional provisions, coupled with the year of the adoption of the Constitution in which they are contained: Alabama (1901), Art. I, §§ 4, 12; Arizona (1912), Art. II, § 6; Arkansas (1874), Art. II, § 6; California (1879), Art. I, § 9; Colorado (1876), Art. II, § 10; Delaware (1897), Art. I, § 5; Florida (1887), Decl. Rts., § 13; Georgia (1877), Art. I, § 1, par. 15; Idaho (1890), Art. I, § 9; Illinois (1870), Art. II, § 4; Indiana (1851), Art. I, § 9; Iowa (1857), Art. I, § 7; Kansas (1861), Bill Rts., § 11; Kentucky (1891), §§ 8, 9; Louisiana (1921), Art. I, § 3; Maine (1876), Art. I, § 4; Maryland (1867), Decl. Rts., Art. 40; Michigan (1909), Art. II, § 4; Minnesota (1857), Art. I, § 3; Mississippi (1890), Art. III, § 13; Missouri (1945), Art. I, § 8; Montana (1889), Art. III, § 10; Nebraska (1875), Art. I, § 5; Nevada (1864), Art. I, § 9; New Jersey (1947), Art. I, § 6; New Mexico (1912), Art. II, § 17; New York (1938), Art. I, § 8; North Carolina (1876), Art. I,

in assuming that the men who sponsored the Fourteenth Amendment in Congress, and those who ratified it in the State Legislatures, knew of such provisions then in many of their State Constitutions. Certainly they were not consciously canceling them or calling them into question, or we would have some evidence of it. Congresses, during the period while this Amendment was being considered or was but freshly adopted, approved Constitutions of "Reconstructed" States that expressly mentioned state libel laws,[7] and also approved similar Constitutions for States erected out of the federal domain.[8]

---

§ 20; North Dakota (1889), Art. I, § 9; Ohio (1851), Art. I, § 11; Oklahoma (1907), Art. II, § 22; Oregon (1859), Art. I, § 8; Pennsylvania (1874), Art. I, § 7; Rhode Island (1843), Art. I, § 20; South Dakota (1889), Art. VI, § 5; Tennessee (1870), Art. I, § 19; Texas (1876), Art. I, § 8; Utah (1895), Art. I, § 15; Virginia (1902), Art. I, § 12; Washington (1889), Art. I, § 5; West Virginia (1872), Art. III, § 7; Wisconsin (1848), Art. I, § 3; Wyoming (1889), Art. I, § 20.

[7] Congress required that Reconstructed States approve State Constitutions consistent with the Federal Constitution, and also that each State ratify the Fourteenth Amendment. Examples of state constitutional provisions expressly referring to libel, but which Constitutions were nevertheless approved by Congress, follow: Arkansas: Const. 1868, Art. I, § 2 provides that truth coupled with good motives shall be a complete defense to a criminal libel prosecution; Arkansas readmitted by 15 Stat. 72 (1868); Florida: Const. 1868, Art. I, § 10 provides that truth coupled with good motives shall be a complete defense to a criminal libel prosecution; Florida readmitted by 15 Stat. 73 (1868); Mississippi: Const. 1868, Art. I, § 4 enacts Fox's Libel Act in substance; Mississippi readmitted by 16 Stat. 67 (1870); South Carolina: Const. 1868, Art. I, § 8 enacts Fox's Libel Act in substance, and provides that truth and good motives shall be a complete defense to a criminal libel prosecution; South Carolina readmitted by 15 Stat. 73 (1868); Texas: Const. 1868, Art. I, § 6 enacts Fox's Libel Act in substance; Texas readmitted by 16 Stat. 80 (1870).

[8] In the case of States erected out of the public domain, one of two procedures was generally followed. Either Congress would itself enact a statute admitting a particular State, stating therein that the

Certainly this tolerance of state libel laws by the very authors and partisans of the Fourteenth Amendment shows either that they were not intending to incorporate the First Amendment or that they believed it would not prevent federal libel laws. Adoption of the incorporation theory today would lead to the dilemma of either confining the States as closely as the Congress or giving the Federal Government the latitude appropriate to state governments. The treatment of libel powers corroborates the conclusions against the incorporationist theory reached by the most comprehensive and objective studies of the origin and adoption of the Fourteenth Amendment.[9]

The inappropriateness of a single standard for restricting State and Nation is indicated by the disparity between their functions and duties in relation to those freedoms. Criminality of defamation is predicated upon power either to protect the private right to enjoy integrity of reputation or the public right to tranquillity. Neither of these are objects of federal cognizance except when necessary to the accomplishment of some delegated power, such as

---

Constitution of the State in question was consistent with the Federal Constitution; or else the Congressional Act would provide that the State would be admitted upon its adoption of a Constitution consistent with the Federal Constitution. In the latter case the actual admission occurred by proclamation of the President.

Colorado: Art. II, § 10 enacts Fox's Libel Act in substance, and provides that truth and good motives shall constitute a complete defense in a libel prosecution; admitted by 18 Stat. 474 (1875), 19 Stat. 665 (1876); Montana: Art. III, § 10 enacts Fox's Libel Act in substance; admitted by 25 Stat. 676 (1889), 26 Stat. 1551 (1889); New Mexico: Art. II, § 17 provides that truth and good motives shall constitute a complete defense to a criminal libel prosecution; admitted by 36 Stat. 557 (1910), 37 Stat. 39 (1911); Utah: Art. I, § 15 like Colorado provisions; admitted by 28 Stat. 107 (1894), 29 Stat. 876 (1896); Wyoming: Art. I, § 20 like Colorado provisions; admitted by 26 Stat. 222 (1890).

[9] See Fairman and Morrison, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan. L. Rev. 5–173.

protection of interstate commerce. When the Federal Government puts liberty of press in one scale, it has a very limited duty to personal reputation or local tranquillity to weigh against it in the other. But state action affecting speech or press can and should be weighed against and reconciled with these conflicting social interests.

For these reasons I should not, unless clearly required, confirm to the Federal Government such latitude as I think a State reasonably may require for orderly government of its manifold concerns. The converse of the proposition is that I would not limit the power of the State with the severity appropriately prescribed for federal power.

As the principle by which to judge the constitutionality of this statute, I accept the dissent in *Gitlow* and the decision in *Palko*.

## II.

What restraints upon state power to punish criminal libel are implied by the "concept of ordered liberty"? Experience by Anglo-Saxon peoples with defamation and laws to punish it extends over centuries and the statute and case books exhibit its teachings. If one can claim to announce the judgment of legal history on any subject, it is that criminal libel laws are consistent with the concept of ordered liberty only when applied with safeguards evolved to prevent their invasion of freedom of expression.

Oppressive application of the English libel laws was partially checked when Fox's Libel Act of 1792 allowed the jury to determine whether an accused publication was libelous in character and more completely when Lord Campbell's Libel Act of 1843 allowed truth to be proved as a defense.

American experience teaches similar lessons. The leading state case is *People* v. *Croswell*, 3 Johns. (N. Y.) 337.

Since, as the opinion of this Court now points out, the Jeffersonian's objection to federal sedition prosecutions was largely fear of federal usurpation of state powers over the subject, it was consistent for them to prosecute libels under state law. Croswell, publisher of the aptly named Wasp, was indicted for libeling Thomas Jefferson by representing him as unworthy of the confidence, respect, and attachment of the people. The trial judge pronounced his statements libelous as a matter of law and allowed the jury to decide no question except whether the accused had published them. The defendant was convicted and on his appeal, argued by Alexander Hamilton, the appellate court divided equally. Justice Kent, however, filed a characteristically learned and vigorous opinion that the trial court must submit the libelous character of the article and libelous intent of its printer to decision by the jury, which was entitled to determine both law and fact. The public response was such that an early session of the Legislature substantially enacted Kent's contentions. Inasmuch as no judgment had been entered upon the earlier equal division, the court at its August 1805 Term, "in consequence of this declaratory statute," unanimously awarded a new trial.[10]

The New York Constitution at that time contained no free speech provision but the case led to a provision included in the Constitution of 1821 which both followed Fox's Libel Act and anticipated Lord Campbell's Act and has remained in the several Constitutions of that State since:

> "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments

---

[10] 3 Johns. (N. Y.) 337, 413.

for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." [11]

It would not be an exaggeration to say that, basically, this provision of the New York Constitution states the common sense of American criminal libel law. Twenty-four States of the Union whose Constitutions were framed later substantially adopted it.[12] Twelve States provide that press and speech shall be free but there shall be responsibility for the abuse.[13] Five others provide substantially the same but add that truth may be given in evidence in a libel prosecution.[14] Only five States, whose Constitutions were framed earlier, were content with the generality about the free press similar to that of Massachusetts.[15] But all of these States, apart from consti-

---

[11] Const. 1821, Art. VII, § 8; Const. 1846, Art. I, § 8; Const. 1894, Art. I, § 8; Const. 1938, Art. I, § 8.

[12] Arkansas, California, Colorado, Delaware, Florida, Iowa, Kansas, Maine, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Wisconsin, and Wyoming. For citations to article and section, see n. 6, *supra*.

[13] Arizona, Georgia, Idaho, Kentucky, Louisiana, Maryland, Michigan, Minnesota, North Carolina, Oregon, Virginia, and Washington. The Georgia provision (Const. 1877, Art. I, § 1, par. 15), representative of the rest, reads: ". . . any person may speak, write, and publish his sentiments, on all subjects, being responsible for the abuse of that liberty." For citations to article and section, see n. 6, *supra*.

[14] Alabama, Illinois, Indiana, Rhode Island, and West Virginia. For citations to article and section, see n. 6, *supra*.

[15] Connecticut, Const. 1818, Art. I, § 6; New Hampshire, Const. 1784, Part I, Art. 22; South Carolina, Const. 1895, Art. I, § 4; Vermont, Const. 1793, c. I, Art. 13. The Massachusetts provision (Const. 1780, Part I, Art. XVI) reads as follows: "The liberty of the press is essential to the security of freedom in a state it ought not, therefore, to be restricted in this commonwealth."

tutional provision, have by decisional law recognized the validity of criminal libel prosecutions.[16]

Because of these safeguards, state libel laws have presented no threat to a free press comparable to that from federal sources and have not proved inconsistent with fundamental liberties. Attacks on the press by States which were frustrated by this Court in *Near* v. *Minnesota, supra,* and *Grosjean* v. *American Press Co.,* 297 U. S. 233, were not by libel laws. For near a century and a half this Court's decisions left state criminal libel prosecutions entirely free of federal constitutional limitations. It is a matter of notoriety that the press often has provoked hostility, that editors have been mobbed and horsewhipped, but criminal libel prosecutions have not been frequent and, as safeguarded by state law, they have been so innocuous that chronicles of American journalism give them only passing mention.[17]

This Court, by construction of the Fourteenth Amendment, has imposed but one addition to the safeguards voluntarily taken upon the States by themselves. It is that where expression, oral or printed, is punished, although it has not actually caused injuries or disorders but is thought to have a tendency to do so, the likelihood of such consequence must not be remote or speculative. That is the "clear and present danger" test which Mr. Justice Holmes and Mr. Justice Brandeis, eventually with support of the Court, thought implied in both the First [18] and Fourteenth Amendments,[19] although the former was

---

[16] *State* v. *Gardner,* 112 Conn. 121, 151 A. 349; *Commonwealth* v. *Szliakys,* 254 Mass. 424, 150 N. E. 190; *Noyes* v. *Thorpe,* 73 N. H. 481, 62 A. 787; *State* v. *Gurry,* 163 S. C. 1, 161 S. E. 191; *State* v. *Colby,* 98 Vt. 96, 126 A. 510. Decisional law of other States is collected in Note, 1 Bflo. L. Rev. 258.

[17] Lee, A History of American Journalism (Garden City, 1923).

[18] *Schenck* v. *United States,* 249 U. S. 47, 52.

[19] *Gitlow* v. *New York,* 268 U. S. 652, 672.

not bodily bound up in the latter. Any superficial inconsistency between applying the same standard but permitting a wider range of action to the States is resolved upon reference to the latter part of the statement of the formula: clear and present danger of *those substantive evils which the legislature has a right to prevent.* The evils at which Congress may aim, and in so doing come into conflict with free speech, will be relatively few since it is a government of limited powers. Because the States may reach more evils, they will have wider range to punish speech which presents clear and present danger of bringing about those evils.

In few subjects so much as libel does local law, in spite of varying historical influences, afford a consensus of American legal opinion as to what is reasonable and essential to the concept of ordered government. The boundaries are roughly outlined, to be sure, and cannot be stated or applied with mathematical precision, but those widely accepted state constitutional provisions on which is superimposed the "clear and present danger" test for "tendency" cases seem to be our best guide.

I agree with the Court that a State has power to bring classes "of any race, color, creed, or religion" within the protection of its libel laws, if indeed traditional forms do not already accomplish it.[20] But I am equally clear that in doing so it is essential to our concept of ordered liberty that the State also protect the accused by those safeguards the necessity for which is verified by legal history.

## III.

The Illinois statute, as applied in this case, seems to me to have dispensed with accepted safeguards for the accused. Trial of this case ominously parallels the trial of

---

[20] It appears that group libel was not unknown to common law. See Scott, Publishing False News, 30 Can. B. Rev. 37, 42–43.

*People* v. *Croswell, supra,* in that the Illinois court here instructed the jury, in substance, that if it found that defendant published this leaflet he must be found guilty of criminal libel.

Rulings of the trial court precluded the effort to justify statements of fact by proving their truth. The majority opinion concedes the unvarying recognition by the States that truth plus good motives is a defense in a prosecution for criminal libel. But here the trial court repeatedly refused defendant's offer of proof as to the truth of the matter published. Where an offer to prove the dominant element of a defense is rejected as immaterial, we can hardly refuse to consider defendant's constitutional question because he did not go through the useless ceremony of offering proof of a subsidiary element of the defense. If the court would not let him try to prove he spoke truth, how could he show that he spoke truth for good ends? Furthermore, the record indicates that defendant was asked to state what he had meant by the use of certain phrases, and the reason for forming the White Circle League—statements which apparently bore on the issue of motive and ends. But the trial court sustained a sweeping objection "to this whole line of examination." The Supreme Court of Illinois noted the offer of proof of truth and its exclusion, and apparently went on to rule as a matter of law that the statement was not published for justifiable ends. At all events, it is clear that the defense was ruled out as matter of law and defendant was never allowed to present it for decision by either court or jury upon the facts, a practice which I think is contrary to the overwhelming verdict of Anglo-Saxon history and practice. I do not intimate that this defendant stood even a remote chance of justifying what impresses me, as it did the trial court, as reckless and vicious libel. But the point is that his evidence, proffered for that purpose, was excluded instead of being

received and evaluated. Society has an interest in preserving truth as a justification, however obnoxious the effort may be. A publication which diffuses its attack over unnamed and impersonal multitudes is likely to be harder to justify than one which concentrates its attack on named individuals, but the burden may properly be cast on an accused and punishment follow failure to carry it.

The same may be said of the right to comment upon matters of public interest insofar as the statement includes matters of opinion, a point, however, which the defense may have inadequately raised. When any naturally cohesive or artificially organized group possesses a racial or sectarian solidarity which is or may be exploited to influence public affairs, that group becomes a legitimate subject for public comment. Of course, one can only deplore the habitual intemperance and bitter disparagement which characterizes most such comment. While I support the right of a State to place decent bounds upon it, I am not ready to hold that group purposes, characteristics and histories are to be immunized from comment or may be discussed only at the risk of prosecution free of all usual safeguards.

Another defense almost universally recognized, which it seems the jury were not allowed to consider here, is that of privilege. Petition for redress of grievances is specifically privileged by many State Constitutions. I do not think we should hold this whole document to be constitutionally privileged just because, in part, it simulates a petition for redress of grievances. A court or jury could have found that its primary purpose was not to petition but to appeal for members and contributions to the White Circle League. If some part of it were privileged, that, so it has been held, does not extend constitutional protection to unprivileged matter. Cf. *Valentine* v. *Chrestensen,* 316 U. S. 52. But the question of privilege seems

not to have been specifically passed on by the court and certainly was not submitted for the jury's consideration.

In this case, neither the court nor jury found or were required to find any injury to any person, or group, or to the public peace, nor to find any probability, let alone any clear and present danger, of injury to any of these. Even though no individuals were named or described as targets of this pamphlet, if it resulted in a riot or caused injury to any individual Negro, such as being refused living quarters in a particular section, house or apartment, or being refused employment, certainly there would be no constitutional obstacle to imposing civil or criminal liability for actual results. But in this case no actual violence and no specific injury was charged or proved.

The leaflet was simply held punishable as criminal libel *per se* irrespective of its actual or probable consequences. No charge of conspiracy complicates this case. The words themselves do not advocate the commission of any crime. The conviction rests on judicial attribution of a likelihood of evil results. The trial court, however, refused to charge the jury that it must find some "clear and present danger," and the Supreme Court of Illinois sustained conviction because, in its opinion, the words used had a tendency to cause a breach of the peace.

Referring to the clear and present danger doctrine in *Dennis* v. *United States,* 341 U. S. 494, 568, I said:

"I would save it, unmodified, for application as a 'rule of reason' in the kind of case for which it was devised. When the issue is criminality of a hot-headed speech on a street corner, or circulation of a few incendiary pamphlets, or parading by some zealots behind a red flag, or refusal of a handful of school children to salute our flag, it is not beyond the capacity of the judicial process to gather, comprehend, and weigh the necessary materials for decision whether it is a clear and present danger of

substantive evil or a harmless letting off of steam.   It is not a prophecy, for the danger in such cases has matured by the time of trial or it was never present.   The test applies and has meaning where a conviction is sought to be based on a speech or writing which does not directly or explicitly advocate a crime but to which such tendency is sought to be attributed by construction or by implication from external circumstances.   The formula in such cases favors freedoms that are vital to our society, and, even if sometimes applied too generously, the consequences cannot be grave. . . ."

Not the least of the virtues of this formula in such tendency cases is that it compels the prosecution to make up its mind what particular evil it sought or is seeking to prevent.   It must relate its interference with speech or press to some identifiable evil to be prevented.   Words on their own account are not to be punished in such cases but are reachable only as the root of punishable evils.

Punishment of printed words, based on their *tendency* either to cause breach of the peace or injury to persons or groups, in my opinion, is justifiable only if the prosecution survives the "clear and present danger" test.   It is the most just and workable standard yet evolved for determining criminality of words whose injurious or inciting tendencies are not demonstrated by the event but are ascribed to them on the basis of probabilities.

Its application is important in this case because it takes account of the particular form, time, place, and manner of communication in question.   "The moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers.   Each, in my view, is a law unto itself . . . ."   *Kovacs* v. *Cooper,* 336 U. S. 77, 97. It would consider whether a leaflet is so emotionally exciting to immediate action as the spoken word, especially

the incendiary street or public speech. *Terminiello* v. *Chicago,* 337 U. S. 1, 13; *Kunz* v. *New York,* 340 U. S. 290, 295. It will inquire whether this publication was obviously so foul and extreme as to defeat its own ends, whether its appeals for money—which has a cooling effect on many persons—would not negative its inflammatory effect, whether it would not impress the passer-by as the work of an irresponsible who needed mental examination.

One of the merits of the clear and present danger test is that the triers of fact would take into account the realities of race relations and any smouldering fires to be fanned into holocausts. Such consideration might well warrant a conviction here when it would not in another and different environment.

Group libel statutes represent a commendable desire to reduce sinister abuses of our freedoms of expression—abuses which I have had occasion to learn can tear apart a society, brutalize its dominant elements, and persecute, even to extermination, its minorities. While laws or prosecutions might not alleviate racial or sectarian hatreds and may even invest scoundrels with a specious martyrdom, I should be loath to foreclose the States from a considerable latitude of experimentation in this field. Such efforts, if properly applied, do not justify frenetic forebodings of crushed liberty. But these acts present most difficult policy and technical problems, as thoughtful writers who have canvassed the problem more comprehensively than is appropriate in a judicial opinion have well pointed out.[21]

No group interest in any particular prosecution should forget that the shoe may be on the other foot in some prosecution tomorrow. In these, as in other matters, our

[21] Tanenhaus, Group Libel, 35 Cornell L. Q. 261; Riesman, Democracy and Defamation: Control of Group Libel, 42 Col. L. Rev. 727; see also Note, 1 Bflo. L. Rev. 258.

guiding spirit should be that each freedom is balanced with a responsibility, and every power of the State must be checked with safeguards. Such is the spirit of our American law of criminal libel, which concedes the power to the State, but only as a power restrained by recognition of individual rights. I cannot escape the conclusion that as the Act has been applied in this case it lost sight of the rights.