William D. Krebs, J.
The indictment accuses “ the defendants in the County of St. Lawrence in or about the month of September, 1959, sold and distributed obscene, lewd, lascivious, filthy, indecent and disgusting magazines, which magazines were designed, composed, written and illustrated as a whole to appeal to prurient interest and to exploit the same commercially ’ ’, pursuant to section 1141 of the Penal Law, and 31 additional counts alleging a specific issue of a specific magazine. The defendants demurred on the grounds that the facts stated do not constitute a crime. Therefore, the resolution of this demurrer is dependent upon the concept of crime.
A crime is an inexcusable act committed by an individual in excess of his personal liberties and injures person or property within the victims’ personal freedom or property right.[1]
*553 What is liberty or freedom!
Liberty and freedom are our heritage starting with the Magna Oharta (“ 2. We also have granted to all the freemen of our kingdom, for us and for our heirs for ever, all the unwritten liberties, to be had and holden by them and their heirs, of us and our heirs forever ”) and following with the Declaration of Independence (“We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are Life, Liberty and pursuit of Happiness.”). The Preamble of the United States Constitution advises that the document was passed to “ secure the Blessings of Liberty to ourselves and *554 our Posterity,” and in furtherance of that purpose the First,[2] Fifth and Fourteenth[3] Amendments were passed. The New York State Constitution provides (“ We, the people of the State of New York, grateful to Almighty God for our Freedom ”). This freedom and liberty of men should be absolute with the one exception — [4] that when the exercise of that liberty infringes upon the liberty of another, the actor invading another’s liberty commits a wrong and to protect individuals from that invasion, society may class such invasion as crime, and provide for punishment.[5]
*555 Every utterance which does not infringe upon another’s person or “ property ” is protected by the First Amendment[6] and these utterances need not have the slightest redeeming social importance[7]; otherwise, our “Bill of Bights ” does not insure liberty.[8]
*556 What happens if this freedom is shackled with ‘ ‘ well-meaning ” but unconstitutional laws? We pride ourselves on living under a “ rule of law, not of men ”, yet these laws are made by men and interpreted by men. We propagandize today that we are a part of the “ free ” world. Let us not only preserve our freedoms but ascent to the higher recognition that we have not yet eliminated historical and ecclesiastical restrictions imposed in the day of divine monarchs and bishops8, 8-A which are contrary in spirit to our principles of the integrity of the individual.
The history of our country has shown an increased awareness [9] of the “ rights of man ”, but to the extent we still retain “ laws of men ” and endeavor to force the majorities’ concept of social morality on a minority, respect for the law deteriorates! Sometimes this disrespect culminates in a Declaration of Independence; sometimes in armed rebellion; but even more insidious, in the citizenry who pay lip service to law but deliberately violate those social laws which are contrary to their mores. This open disrespect for the law is contagious and is today’s source of crime increase. Maintain the high simple principles of criminal law without “ passing a law” for every moral or bureaucratic problem, and real lawlessness will be confined to the true criminal antisocial misfit.[10]
*557 Moses, by divine guidance, encompassed human conduct in the Decalogue,[11] while Jesus limited the Commandments to but two.[12] Has today’s page upon page and volume upon volume of legislative prohibitions improved human conduct ?
If our criminal law is to harmonize with our profession of constitutional belief in the inviolable individual liberty and freedom, then, as repugnant as it may be to some, we must insure that no individual is punished when innocent, even at the public expense of some unpunished guilty. The horrible alternative of guaranteed punishment to all guilty is the danger of punishing an occasional innocent.
The indictment does not allege behavior beyond the defendants’ protected sphere of freedom.[13] No “victims” person or property has been invaded or damaged.[14] Without passing on the relation of the “ clear and present danger ” doctrine[15] to *558 “ principled ” criminal law, there is no allegation of such danger in the present instance.[16]
*560 You cannot legislate morals![17] Not the slightest door crack[18] shall interfere with each individual’s exercise of liberty and freedom unharmful to others.[19]
*561 Obscenity may disgust others and may concern parents in its effect on their children, as it does this court. The responsibility of obscenity treatment should lie in the upbringing of the children and in society’s social and economic pressure[20] — not in the State and its police. More to be feared is the slightest impingement of our heritage of freedom and its increasing development.
Obscenity statutes may have been our heritage — as have other “ laws ” which have been tested against our principles of freedom and liberty and then discarded on our upward progress to better law. Obscenity cannot be compared with libel[21] — libel is expressed in excess of a person’s freedom and invades another’s to the victim’s damage.[22]
Subdivision 1 of section 1141 of the Penal Law is contrary to the letter and spirit of the Fourteenth Amendment of the United States Constitution and section 8 of article I of the Constitution of the State of New York and the indictment should be dismissed.

. Roth v. United States, 354 U. S. 476, 509.
“By these standards punishment is inflicted for thoughts provoked, not for overt acts nor antisocial conduct. This test cannot be squared with our decisions under the First Amendment. Even the ill-starred Dennis case conceded that speech to be punishable must have some relation to action which could be penalized by government. Dennis v. United States, 341 U. S. 494, 502-511. Of. Chafee, The Blessings of Liberty (1956), p. 69. This issue cannot be avoided by saying that obscenity is not protected by the First Amendment. The question remains, what is the constitutional test of obscenity 1 * * *
“ The test of obscenity the Court endorses today gives the censor free range over a vast domain. To allow the State to step in and punish mere speech or publication that the judge or the jury thinks has an undesirable impact on thoughts hut that is not shown to be a part of unlawful action is drastically to curtail the First Amendment. As recently stated by two of our outstanding authorities on obscenity, ‘ The danger of influencing a change in the current moral standards of the community, or of shocking or offending readers, or of stimulating sex thoughts or desires apart from objective conduct, can never justify the losses to society that result from interference with literary freedom.’ Lockhart & McClure, Literature, The Law of Obscenity and the Constitution, 38 Minn. L. Rev. 295, 387.
“If we were certain that impurity of sexual thoughts impelled to action, we would be on less dangerous ground in punishing the distributors of this sex literature. But it is by no means clear that obscene literature, as so defined, is a significant factor in influencing substantial deviations from the community standards.
“‘There are a number of reasons for real and substantial doubts as to the soundness of that hypothesis. (1) Scientific studies of juvenile delinquency demonstrate that those who get into trouble, and are the greatest concern of the advocates of censorship, are far less inclined to read than those who do not become delinquent. The delinquents are generally the adventurous type, who have little use for reading and other non-active entertainment. Thus, *553 even assuming that reading sometimes has an adverse effect upon moral conduct, the effect is not likely to be substantial, for those who are susceptible seldom read. (2) Sheldon and Eleanor Glueck, who are among the country’s leading authorities on the treatment and causes of juvenile delinquency, have recently published the results of a ten year study of its causes. They exhaustively studied approximately 90 factors and influences that might lead to or explain juvenile delinquency, but the Glueeks gave no consideration to the type of reading material, if any, read by the delinquents. This is, of course, consistent with their finding that delinquents read very little. When those who know so much about the problem of delinquency among youth — the very group about whom the advocates of censorship are most concerned — conclude that what delinquents read has so little effect upon their conduct that it is not worth investigating in an exhaustive study of causes, there is good reason for serious doubt concerning the basic hypothesis on which obscenity censorship is defended. (3) The many other influences in society that stimulate sexual desire are so much more frequent in their influence, and so much more potent in their effect, that the influence of reading is likely, at most, to be relatively insignificant in the composite of forces that lead an individual into conduct deviating from the community sex standards. The Kinsey studies show the minor degree to which literature serves as a potent sexual stimulant. And the studies demonstrating that sex knowledge seldom results from reading indicates [sic] the relative unimportance of literature in sex thoughts as compared with other factors in society.’ Lockhart & McClure, op. cit. supra, pp. 385-386.
“The absence of dependable information on the effect of obscene literature on human conduct should make us wary. It should put us on the side of protecting society’s interest in literature, except and unless it can be said that the particular publication has an impact on action that the government can control. * * *
“The standard of what offends ‘the common conscience of the community’ conflicts, in my judgment, with the command of the First Amendment that ‘ Congress shall make no law * * * abridging the freedom of speech, or of the press.’ Certainly that standard would not be an acceptable one if religion, economics, politics or philosophy were involved. How does it become a constitutional standard when literature treating with sex is concerned ?
“Any test that turns on what is offensive to the community’s standards is too loose, too capricious, too destructive of freedom of expression to be squared with the First Amendment.”

. Both v. United States, 354 U. S. 476, 508.
“When we sustain these convictions, we make the legality of a publication turn on the purity of thought which a book or tract instills in the mind of the reader. I do not think we can approve that standard and be faithful to the command of the First Amendment, which by its terms is a restraint on Congress and which by the Fourteenth is a restraint on the States.”

. Both v. United States, 354 U. S. 476, 501.
“We can inquire only whether the state action so subverts the fundamental liberties implicit in the Due Process Clause that it cannot be sustained as a rational exercise of power. See Jackson, J., dissenting in Beauharnais v. Illinois, 343 U. S. 250, 287. The States’ power to make printed words criminal is, of course, confined by the Fourteenth Amendment, but only insofar as such power is inconsistent with our concepts of [1] ordered liberty.’ ”

. See Footnote No. 1.

. John Stuart Mill, Essay on Liberty, American State Papers, Encyclopedia Britannica, Inc., Vol. 43, p. 270.
“ The object of this Essay is to assert one very simple principle, as entitled to govern absolutely the dealings of society with the individual in the way of compulsion and control, whether the means used be physical force in the form of legal penalties, or the moral coercion of public opinion, That principle is, that the sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of their number, is self-protection. That the only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinions of others, to do so would be wise, or even right. These are good reasons for remonstrating with him, or reasoning with him, or persuading him, or entreating him, but not for compelling him, or visiting him with any evil in case he do otherwise. To justify that, the conduct from which it is desired to deter him must be calculated to produce evil to some one else. The only part of the conduct of any one, for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign.
“This, then, is the appropriate region of human liberty. It comprises, first, the inward domain of consciousness; demanding liberty of conscience in the most comprehensive sense; liberty of thought and feeling; absolute freedom of opinion and sentiment on all subjects, practical or speculative, scientific, moral, *555 or theological. The liberty of expressing and publishing opinions may seem to fall under a different principle, since it belongs to that part of the conduct of an individual which concerns other people; but, being almost of as much importance as the liberty of thought itself, and resting in great part on the same reasons, is practically inseparable from it. Secondly, the principle requires liberty of tastes and pursuits; of framing the plan of our life to suit our own character; of doing as we like, subject to such consequences as may follow; without impediment from our fellow creatures, so long as what we do does not harm them, even though they should think our conduct foolish, perverse, or wrong. Thirdly, from this liberty of each individual, follows the liberty, within the same limits, of combination among individuals; freedom to unite, for any purpose not involving harm to others.
“No society in which these liberties are not, on the whole, respected is free, whatever may be its form of government; and one is completely free in which they do not exist absolute and unqualified. The only freedom which deserves the name, is that of pursuing our own good in our own way, so long as. we do not attempt to deprive others of theirs, or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily, or mental and spiritual. Mankind are greater gainers by suffering each other to live as seems good to themselves, than by compelling each other to live as seems good to the rest.”

. Both v. United States, 354 U. S. 476, 483.
(1) “In light of this history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous utterances are not within the area of constitutionally protected speech. Beauharnais V. Illinois, 343 U. S. 250, 266. At the time of the adoption of the First Amendment, obscenity law was not as fully developed as libel law, but there is sufficiently contemporaneous evidence to show that obscenity, too, was outside the protection intended for speech and press.”

. Both v. United States, 354 U. S. 476, 484.
“The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. * '* *
“All ideas having even the slightest redeeming social importance — unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion — have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained ”.

. Both v. United States, 354 TJ. S. 476, 507.
“ I cannot agree that any book which tends to stir sexual impulses and lead to sexually impure thoughts necessarily is ' utterly without redeeming social importance.’ ”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 207.10, p. 5.
“ Punishment for obscenity was a matter almost exclusively within the jurisdiction of the Church in England prior to the Eighteenth Century. As late as 1708 it was held that the writing of an obscene book is not indictable”.
Roth v. United States, 354 U. S. 476, 482 — 483.
“As early as 1712, Massachusetts made it criminal to publish ‘ any filthy, obscene, or profane song, pamphlet, libel or mock sermon ’ in imitation of mimicking of religious services.”

. Roth v. United States, 354 U. S. 476, 495.
“ To recognize the existence of a problem, however, does not require that we sustain any and all measures adopted to meet that problem. The history of the application of laws designed to suppress the obscene demonstrates convincingly that the power of government can be invoked under them against great art or literature, scientific treatises, or works exciting social controversy. Mistakes of the past prove that there is a strong countervailing interest to be considered in the freedoms guaranteed by the First and Fourteenth Amendments.”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 207.10, p. 7.
“A modern law relating to obscenity must also reflect changes in men’s views of the importance of freedom of expression in ideas and in art. Since any effort to repress obscenity involves some restriction of the freedom, those who set a high value on the freedom will be cautious about extending obscenity controls.”

. Bible, Exodus 20 :3-17.

. Bible, Matthew 22:36-40. Mark 12:29-31.

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 270.10, p. 8.
“Much that is sinful and immoral in the opinion of large groups in the community must nevertheless be omitted from the penal code because other equally large groups have different views, or because the threat to society is so minimal that prosecutors and juries will simply disregard the law.”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 270.10, p. 7.
“Public order probably depends considerably on religion and morality in general; but there is very little information as to the influence of obscenity on behavior.”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 270.10, p. 22.
“ (b) Minority Definition: Tendency to Cause Criminal Behavior; Clear and Present Danger ”.
“ Preventing sexual (or other) misbehavior would be a rational goal for obscenity legislation and a few notable recent opinions sought to relate the definition of obscenity directly to tendency to incite crime. This position was powerfully presented by' Judge Curtis Bok in Commonwealth v. Gordon, where he adapted to the law of obscenity the ‘ clear and present danger ’ doctrine, taken from the field of sedition law where it operates both as a constitutional limitation of the legislative power to repress anti-government utterance and as a rule of statutory construction. His opinion would limit obscenity to cases:
“[1] * * * where there is a reasonable and - demonstrable cause to believe that a crime or misdemeanor has been committed or is about to be committed as the preceptible result of the publication and distribution of the writing in question: the opinion of anyone that a tendency thereto exists or that such a result is self-evident is insufficient and irrelevant. The causal connection between the book and the criminal behavior must appear beyond a reasonable doubt.’ Judge Jerome Prank espoused the Bok position in a concurring opinion *558 in United States v. Both, with the modification that it should be sufficient for the prosecution to show a clear danger that material of the type involved in the case probably would induce serious anti-social conduct. The American Civil Liberties Union takes substantially the same view. On the other hand, recent legislatures, moving against ‘ comic-books ’ emphasizing crime, lust and brutality, have included in the statutes legislative findings that improper literature promotes crime and delinquency.
“Unfortunately, both for those who seek to confine obscenity laws to an identifiable evil and for those who seek to expand controls with the hope of reducing juvenile delinquency, we know little or nothing about the consequences of reading obscene or shocking literature. The verdict of two eminent scholars on this point is as follows: ' Although the whole structure of obscenity censorship hinges upon the improved assumption that “ obscene ” literature is a significant factor in causing sexual deviation from the community standard, no report can be found of a single effort at genuine research to test this assumption by singling out as factor for study the effect of sex literature upon sex conduct.’ Indeed, for an undetermined number of individuals, the writing or reading of obscenity may be a substitute for rather than a stimulus to physical sexuality.”
Both v. United States, 354 U. S. 476, 486-487.
“But, in light of our holding that obscenity is not protected speech, the complete answer to this argument is in the holding of this Court in Beauharnais v. Illinois, supra, at p. 266: [1] Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase “ clear and present danger.” Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of Such circumstances. Libel, as we have seen, is in the same class.’ ”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 207.10, pp. 10, 11, 13.
“We reject the prevailing test of tendency to arouse lustful thoughts or desires because it is unrealistically broad for a society that plainly tolerates a great deal of erotic interest in literature, advertising, and art, and because regulation of thought or desire, unconnected with overt misbehavior, raises the most acute constitutional as well as practical difficulties. We likewise reject the common definition of obscene as that which ' tends to corrupt or debase.’ If this means anything different from tendency to arouse lustful thought and desire, it suggests that change of character or actual misbehavior follows from contact with obscenity. Evidence of such consequences is lacking.
“ Evidence as to any significant relationship between comic book horrors and delinquent juvenile behavior consists largely of undocumented opinion by laymen; the weight of professional opinion based on such studies as have been made is against the hypothesis.
“ Judge Frank’s concurring opinion marshals the literature to demonstrate that no connection between obscenity and misbehavior has ever been proved.”
Pornography and the Law — Drs. Eberhard & Phyllis Kronhausen.
“The body of clinical and psychological experience to date strongly points to much deeper causative factors in violent crime than reading. For example. *559 Dr. Robert Lindner, well-known psychoanalyst and writer (The Fifty Minnte Hour, Rebel Without a Cause), specialized in the treatment of offenders with regard to the problem under discussion, and had this to say: ‘I am utterly opposed to censorship of the written word, regardless of the source of such censorship or the type of material it is directed against. As a psychoanalyst who has had more than a decade of experience with the emotionally disturbed, and espeeiallly with delinquents, I am convinced of the absurdity of the idea that any form of reading matter, including the so-called comics and “ other objectionable books ”, can either provoke delinquent or criminal behavior or instruct towards such ends. I am convinced that were all so-called objectionable books and like material to disappear from the face of the earth tomorrow this would in no way effect the statistics of crime, delinquency, amoral and antisocial behavior, or personal illness and distress. The same frustrating and denying society would still exist, and both children and adults would express themselves mutinously against it. These problems will be solved only when we have the courage to face the fundamental social issues and personal perplexities that cause such behavior.’ Indeed it is our view that instead of the comics, ‘lewd’ magazines, or even hard core pornography causing sex murders and other criminal acts, it is far more likely that these ‘ unholy ’ instruments may be more often than not a safety value for the sexual deviate and potential sex offender. This is not only our own view, but that of many other experienced clinicians, especially among those who have worked with more severely disturbed patients and delinquents. Representative of this type of clinical thinking is the conclusion of Dr. Benjamin Karpman, chief psychotherapist of St. Elizabeth Hospital in Washington, who says, ‘ Contrary to popular misconception people who read salacious literature are less likely to become sexual offenders than those who do not, for the reason that such reading often neutralizes what aberrant sexual interests they may have.’
“ There is much corroborative evidence to back up Dr. Karpman’s argument in favor of the therapeutic effect of expressing antisocial impulses (sexual or otherwise) through the operation of fantasy instead of by direct action. The whole concept of ‘ catharsis ’ or ‘ ab-reaetion ’ of such tendencies is a therapeutic setting — in the ease of children, with various play materials, destructible dolls, darts, toy guns, etc., or in the ease of adults, with symbolic representations of strong emotional reactions, free indulgence in otherwise unacceptable fantasies, swearing and cursing, expression through art media or in psycho-drama — are standard accepted clinical practice.
“ Our experience in the projective testing of schizophrenics completely coincides with that of other clinicians with regard to the hostility content in the fantasy stories the patients tell in response to the pictures of the Thematic Apperception Test. This problem has its eminently practical side in decisions about the hospital discharge of mental patients who express, in tests such as the TAT, the Rorschach inkblot test, Sentence Completion Tests, etc. hostile and violent fantasies, often with a decidedly sexual flavor.
“ The inexperienced clinician in these situations is frequently tempted to assume that patients with aggressive fantasies are greater discharge risks than those who only express benign and lovely ideas. Contrary to this assumption, clinical experience has led to the conclusion that those patients whose projective test records show a conspicuous absence of hostile and aggressive, suicidal, or sexual fantasies, are more apt to act out their antisocial impulses than those who are able to express them verbally.”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957, Comments, § 207.10, p. 8.
“1. * * * Finally, a modern obscenity law must reflect modern views of the purpose and proper field of operation of criminal law. Criminal law is not, and cannot be, a code defining right behavior.”
Both v. United States, 354 U. S. 476, 504.
“ Congress has no substantive power over sexual morality.”

. Both v. United States, 354 U. S. 476, 488.
“ The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests.”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 207.10.
“ 4. * * * In support of this position it can be argued that there is no proof that obscenity leads to anti-social behavior, and that adults at least should have the right to procure what pleases them and does not harm others ” (p. 15, italics supplied).
“ * * * as wui he seen below in the discussion of criminal tendency tests, no connection between obscenity and misbehavior has ever been established ” (p. 21; italics supplied).
Both v. United States, 354 U. S. 476, 513-514.
“ I do not think that the problem can be resolved by the Court’s statement that [1] obscenity is not expression protected by the First Amendment.’ With the exception of Beauharnais v. Illinois, 343 U. S. 250, none of our cases has resolved problems of free speech and free press by placing any form of expression beyond the pale of the absolute prohibition of the First Amendment. Unlike the law of libel, wrongfully relied on in Beauharnais, there is no special historical evidence that literature dealing with sex was intended to be treated in a special manner by those who drafted the First Amendment. In fact, the first reported court decision in this country involving obscene literature was in 1821. Lockhart & McClure, op. cit. supra, at 324, n. 200. I reject too the implication that problems of freedom of speech and of the press are to be resolved by weighing against the values of free expression, the judgment of the Court that a particular form of that expression has [1] no redeeming social importance.’ The First Amendment, its prohibition in terms absolute, was designed to preclude courts as well as legislatures from weighing the values of speech against silence. The First Amendment puts free speech in the preferred position.
“Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it. Giboney v. Empire Storage, 336 U. S. 490, 498; Labor Board v. Virginia Power Co., 3Í4 U. S. 469, 477-478. As a people we cannot afford to relax that standard.”

. American Law Institute Model Penal Code (Tentative Draft No. 6, 1957), Comments, § 207.10, p. 9.
“ Furthermore, repression by criminal law may function more liberally than extra-legal controls by private boycott, which might be employed even more extensively than now if no legal remedies were available.”

. See 6 above.

. See 15 above.